REVISED, APRIL 9, 2001

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 99-60429**
_____

**TERRY COUSIN,**

**Plaintiff-Appellee,**

**VERSUS**

**TRANS UNION CORPORATION,**

**Defendant-Appellant.**

_____

Appeal from the United States District Court
For the Northern District of Mississippi
_____

March 21, 2001

Before GARWOOD, DeMOSS, and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

Defendant-Appellant Trans Union Corporation ("Trans Union") appeals, after a jury trial, a final judgment awarding Plaintiff-Appellee Terry Cousin ("Cousin") $50,000 in compensatory damages and $4,470,000 in punitive damages for violating the Fair Credit

Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681u,[1] and for defaming Cousin with malice. Because no reasonable jury could have found that Trans Union acted willfully or with malice and because there was insufficient evidence of actual damages, we vacate the district court's judgment and render in favor of Trans Union.

## I. BACKGROUND

Cousin lives in Clarksdale, Mississippi, with his wife and two teenage daughters, and has worked at the Mississippi Department of Health for 19 years. He has apparently maintained a flawless credit history except for certain items resulting from the fraudulent acts of others posing as Cousin.

In 1984, Cousin's brother Richie misappropriated Cousin's personal identifying information, i.e., his name and social security number, to obtain automobile loans from two different lenders, NBC Bank of Mississippi ("NBC") and City Finance of Okolona ("City Finance"). When Richie failed to pay, the delinquencies were negatively noted on Cousin's file with Trans Union, a consumer reporting agency as defined by the FCRA.

In 1993, Richie again pretended to be Cousin and applied for credit to purchase an automobile in Aberdeen, Mississippi, a place where Cousin has never lived. To purchase the automobile, Richie gave a down payment check that later bounced. The dealer contacted

---

[1]The FCRA is one of seven independent subchapters of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601-1693r.

2

Cousin, who explained that his brother was an impostor. Nevertheless, General Motors Acceptance Corporation ("GMAC"), the apparent lender on that automobile loan, forwarded negative information about Cousin to Trans Union.

On December 6, 1993, Trans Union sent a consumer report to Cousin containing the adverse information about the GMAC account or tradeline. The consumer report also contained negative information about the NBC account and another account with American General and listed a fraudulent Aberdeen address. Cousin immediately informed GMAC of the error, and on December 10, 1993, Cousin filled out Trans Union's Investigation Request Form ("IRF") and requested Trans Union to delete all the fraudulent information. On January 11, 1994, Trans Union responded by sending Cousin a partially corrected consumer report. The GMAC account and the Aberdeen address were deleted, but the consumer report still contained the NBC and American General accounts. Attached to the consumer report was a green postcard that said:

> In response to your recent request, we have reinvestigated disputed information contained on your credit file. The enclosed file reflects the results of our investigation. Some information which was disputed may have been changed or deleted due to the creditor's failure to adequately respond to our verification requests. If the creditor satisfactorily verifies this information in the future, it may be reinstated to the credit file. In the event Trans Union reinstates information to your report as a result of credit grantor verification, you will be notified in writing and you will receive an updated copy of your Trans Union report reflecting the reinstatement.

3

In May 1994, however, Cousin sued Trans Union for its continued reporting of the NBC and American General accounts.[2]  That lawsuit was settled in January 1995, and Trans Union agreed to suppress all the adverse information about NBC and American General.

To suppress the improperly adverse information, Trans Union implemented a procedure called cloaking.  Normally, when information reported to Trans Union is found to be inaccurate after reinvestigation pursuant to § 1681i, it is deleted.  But unless the credit grantor involved also deletes the information from its monthly computer tape submission,[3] the information will be re-reported into the consumer's Trans Union file.  To avert such errors, Trans Union designed a procedure called cloaking.  The cloak is a flag in Trans Union's computer system associated with the subject account.  The cloaking flag prevents the deleted information from reappearing in a consumer's file even if the credit grantor fails to remove the inaccurate information from its magnetic tapes and resubmits the information.  The cloaking flag remains in effect until the credit grantor has deleted the inaccurate information from its tape submissions for twelve consecutive months.  At that point, Trans Union believes that the

---

[2]Cousin also sued Jerry Enis Motors and Equifax, Inc. ("Equifax"), another major consumer reporting agency, for failing to reinvestigate and delete information about the GMAC account.

[3]Credit grantors regularly send to Trans Union magnetic tape data that updates the credit history of their consumers.  The update is usually monthly.

4

credit grantor has deleted the information permanently, and the cloaking flag expires automatically.

On February 6, 1995, three weeks after settling the first lawsuit, Trans Union sent a consumer report to Cousin, which still contained the fraudulent NBC and American General accounts and the Aberdeen address. Furthermore, that consumer report for the first time listed a fraudulent BellSouth Mobility ("BellSouth") account. Richie had apparently opened an account in Cousin's name with BellSouth for cellular phone service in mid-1994.

On February 17, 1995, Cousin completed another IRF, again contesting the NBC and American General accounts and the Aberdeen address. In addition, he challenged for the first time the BellSouth account. On February 28, 1995, Trans Union forwarded another consumer report to Cousin, but it still retained all of the false information. After further communication between Cousin's lawyers and Trans Union, a clean consumer report was furnished to Cousin on March 9, 1995. Moreover, the BellSouth account was cloaked as of that date.[4]

On November 15, 1996, Cousin went to Heafner Motors ("Heafner") to buy a vehicle. After reaching agreement on price and other details, Cousin sought credit to purchase the vehicle.

---

[4]BellSouth also notified Trans Union via a Universal Data Form ("UDF") on December 15, 1995, that the BellSouth account was subscription fraud.

5

The salesman filled out the paperwork and submitted it to the credit manager Bill Harmon.

At trial, Harmon testified that Heafner does not lend any credit.[5] Instead, he stated that Heafner obtains consumer reports on customers to select the best financing match among a group of lenders. Heafner obtained a consumer report on Cousin from Trans Union, which again included the old BellSouth account. The consumer report listed the account as a "P and L write off" and showed it to have a "N09" rating, the worst rating a consumer can receive and which means "bad debt" or "charged off account." Heafner selected GMAC to provide financing for Cousin's purchase and sent his application, but not Trans Union's consumer report, to it.

Like Heafner, GMAC sought a consumer report and obtained one from Equifax. The Equifax report also contained the BellSouth account. GMAC denied in writing Cousin's application for credit to purchase the car from Heafner. GMAC based its denial on two items: 1) the Equifax report containing the BellSouth account and 2) GMAC's own internal record of the loss on the prior GMAC account, which neither the Equifax or Trans Union reports listed.

Cousin called Heafner later in the afternoon of November 15, 1996, and was told that his application had not been approved. On December 11, 1996, Cousin requested disclosure of his file from

---

[5]The retail installment contract, however, would have listed Heafner as the seller/creditor.

Equifax. Before releasing the file to Cousin, Equifax deleted the BellSouth account from the file, thus making Cousin unaware of the BellSouth problem.

On January 13, 1997, Cousin requested a consumer report from Trans Union. Upon receipt, he noticed that the report included the false Aberdeen address and the BellSouth account.[6] As a result, Cousin sent to Trans Union another IRF on January 24, 1997, notifying it that the entries were false.

In response to Cousin's notice, Trans Union sent to Cousin another consumer report, dated February 27, 1997. That report deleted any reference to the BellSouth account, but it restated the GMAC account that had previously been deleted in January 1994. Apparently, GMAC had decided to re-report the old GMAC account after it noted that the Equifax report did not list the GMAC account. Moreover, GMAC had re-reported the old GMAC account, using a different prefix number to designate the account. On March 4, 1997, Cousin notified Trans Union about the GMAC account.[7]

On March 28, 1997, Cousin sued Trans Union, alleging various claims, including 1) negligent violation of the FCRA, 2) willful violation of the FCRA, 3) defamation with malice, and 4) breach of

---

[6]This was the first time that Cousin realized that the BellSouth account had been reinserted. Trans Union did not notify him before the information was reinserted.

[7]As with the BellSouth account, Trans Union did not notify Cousin before reinsertion of the GMAC account.

7

contract.[8]  Notwithstanding this lawsuit challenging its handling of the GMAC account, Trans Union sent to BellSouth a consumer report displaying the GMAC account on April 9, 1997.  Thereafter, Trans Union attempted to recloak the GMAC account on April 21, 1997.  It proved to be short-lived.  The following day, Trans Union pulled Cousin's file off the automated system and manually examined the file, penning certain comments on the file.  Moreover, it uncloaked the file.  Later on May 12, 1997, Trans Union sent a consumer report to GMAC with the GMAC tradeline still on the report.

The jury trial commenced on May 11, 1998.  Before submitting the case to the jury, Trans Union moved for judgment as a matter of law under Federal Rule of Civil Procedure 50.  The district court granted the motion with respect to the breach of contract claim, but denied the rest of the motion.  The jury returned a verdict of $50,000 in compensatory damages and $4,470,000[9] in punitive damages.

On June 4, 1998, Trans Union again moved for judgment as a

---

[8]Cousin also filed suits against several other defendants.  On March 20, 1997, Cousin sued BellSouth, alleging that it "willfully and maliciously and in a secretive manner not reasonably discoverable by plaintiff published the false and libelous Bellsouth tradeline to Trans Union."  Furthermore, on April 7, 1997, Cousin commenced an action against GMAC for re-reporting the GMAC account.  In addition, he filed suits against Equifax and Memphis Consumer Credit, an Equifax affiliate, for negligently reporting the inaccurate BellSouth account to GMAC on November 15, 1996.

[9]This represented one percent of Trans Union's net worth.

matter of law under Rule 50 and moved for a new trial under Rule 59.  In the alternative, Trans Union also moved for a remittitur of the compensatory and punitive damages awards or for a new trial based upon the admission of irrelevant and prejudicial evidence and argument regarding the Heafner automobile transaction.  The district court denied the motions and entered judgment.  This appeal ensued.

## II. DISCUSSION

On appeal, Trans Union contends that it was entitled to judgment as a matter of law with respect to Cousin's claims for negligent violation of the FCRA, willful violation of the FCRA, and defamation with malice.  In the alternative, Trans Union maintains that it merits a remittitur of the compensatory and punitive damages awards or a new trial.  We review those issues in turn.

A.   Standard of Review

"Judgment as a matter of law is proper on an issue if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'"  *Satcher v. Honda Motor Co.*, 52 F.3d 1311, 1316 (5th Cir. 1995) (quoting Fed. R. Civ. P. 50(a)).  When reviewing the denial of a motion for judgment as a matter of law, we will uphold a jury verdict unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary.

*See* *id.* Furthermore, we are bound to view the evidence and all reasonable inferences in the light most favorable to the jury's determination. *See* ***Denton v. Morgan***, 136 F.3d 1038, 1044 (quoting ***Rideau v. Parkem Indus. Servs.***, 917 F.2d 892, 897 (5th Cir. 1990)). Although we might have reached a different conclusion if we had been the trier of fact, we are not free to reweigh the evidence or to reevaluate the credibility of witnesses. *See* *id.* "We must not substitute for the jury's reasonable factual inferences other inferences that we may regard as more reasonable." *Id.*

B. Negligent Noncompliance with the FCRA

Section 1681o[10] provides statutory authority for civil liability for negligent noncompliance with the FCRA. Any person who is negligent in failing to comply with a requirement of the FCRA is liable for any actual damages sustained by the consumer. 15 U.S.C. § 1681o(a). Here, Cousin charged that Trans Union failed to meet the requirements of § 1681e(b).[11] Under that section,

---

[10]That section provides in pertinent part:
Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
   (1) any actual damages sustained by the consumer as a result of the failure;
   (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.
15 U.S.C. § 1681o(a).

[11]In his response brief, Cousin mentions a § 1681i claim. Under that section, a consumer reporting agency after reinvestigation

10

"[w]henever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).

In the present case, Trans Union concedes the inaccuracy of its disclosures but maintains that some of those disclosures were not consumer reports and, therefore, could not have formed the basis of a § 1681e(b) claim.  Moreover, it asserts that it followed reasonable procedures as a matter of law.  Finally, Trans Union argues that the inaccurate information must have been published to a third party and that Cousin must have suffered a credit denial to establish a § 1681e(b) claim.[12]  We review each argument in turn.

First, Trans Union maintains that there was only one consumer report in evidence, the November 15, 1996 report to Heafner.  With respect to the other disclosures of January and February 1997 to Cousin himself, Trans Union submits that they were not consumer

---

must promptly delete from a consumer's file inaccurate, incomplete, or unverifiable information that a consumer disputes.  15 U.S.C. § 1681i(a)(5)(A).  Although Cousin's complaint and the pre-trial order averred general claims of negligent and willful violations of the FCRA, neither specifically stated § 1681i nor did the jury instructions present a claim for violating § 1681i.  Because the record does not establish that a § 1681i claim was ever presented to the jury, we focus solely on the claims seeking redress for noncompliance with § 1681e(b).

[12]Trans Union seems to vacillate as to whether a credit denial is necessary for a § 1681e(b) claim.  At the district court, Trans Union stated on one occasion that a credit denial may not be a prerequisite.  But it then argued that without a denial, Cousin could not establish any causation between Trans Union's alleged failure to comply with § 1681e(b) and Cousin's supposed damages.

11

reports and, hence, could not have formed the basis for a claim under § 1681e(b), which concerns the preparation of consumer reports.[13] Trans Union contends that, by definition, a consumer report is a communication of information to a third party bearing on a consumer's eligibility for credit. Because the January and February 1997 disclosures were only to Cousin, Trans Union asserts that they cannot be consumer reports.

Trans Union further argues that the qualified immunity afforded § 1681g disclosures to consumers pursuant to § 1681h(e) necessarily distinguishes the January and February 1997 disclosures from consumer reports like the one sent to Heafner. Section 1681g pertains to the disclosure of information in a consumer's file to consumers who make a request to a consumer reporting agency. Under § 1681h(e), disclosures made pursuant to § 1681g may not be the predicate for a consumer's common law claims of defamation or negligence against a consumer reporting agency unless the disclosures contained information furnished with malice or willful

---

[13]In its initial brief, Trans Union argues that the report sent to Heafner and the two disclosures in January and February were the only possible "consumer reports." Interestingly, it speaks very little of its disclosures of Cousin's file to BellSouth and to GMAC on April 9 and May 12, 1997, respectively. Only in the reply to Cousin's brief, which clearly raises those two disclosures, does Trans Union address them. Although those two disclosures were transmitted after the filing of Cousin's complaint, the pretrial order clearly included those publications, and Cousin presented evidence about them at trial. Consequently, those disclosures were a part of the trial record. *See* Fed. R. Civ. P. 16(e) ("[Pretrial] order shall control the subsequent course of the action unless modified by a subsequent order.").

intent to injure the consumer. Moreover, § 1681h(e) excludes from qualified immunity those actions commenced under §§ 1681n and 1681o. Trans Union suggests that the January and February 1997 disclosures to Cousin were not consumer reports because it is illogical to make disclosures to consumers qualifiedly immune from common law torts such as negligence but still allow them to be characterized as consumer reports and, consequently, vulnerable to attack under § 1681o as the purported by-product of negligent noncompliance with § 1681e(b).

Although Trans Union's argument that the January and February disclosures were not consumer reports may be valid, especially in light of § 1681h(e), we generally do not consider on appeal matters not presented to the trial court. *Webb v. Investacorp Inc.*, 89 F.3d 252, 257 n.2 (5th Cir. 1996). Other than, 1) a general statement by Trans Union in its answer denying Cousin's characterization of his communications with Trans Union and the nature of those documents, and 2) an attempt to include a jury instruction that no credit reports were disseminated in the instant case and that all the reports admitted in evidence were file disclosures, which attempt failed and which Trans Union did not object to, Trans Union did not present any argument remotely suggesting that the January and February 1997 disclosures, or any other disclosures, were not consumer reports for purposes of a § 1681e(b) claim. Hence, we decline to address Trans Union's

13

position that the January and February 1997 disclosures were not consumer reports.

Trans Union's second argument for reversing the district court's denial of its motion for judgment as a matter of law concerns the reasonableness of its cloaking procedure. The adequacy of the consumer reporting agency's procedures is judged according to what a reasonably prudent person would do under the circumstances. *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982). In the majority of cases, reasonableness is a question for the jury. *Cahlin v. General Motors Acceptance Corp.*, 936 F.2d 1151, 1156 (11th Cir. 1991). Trans Union, however, maintains that its procedure should be deemed to be reasonable as a matter of law because, unlike other reported cases that concerned a consumer reporting agency's inadequate response to a known problem, it had no way to know that its cloaking system would fail. It argues that BellSouth and GMAC should have notified it before re-reporting their erroneous information about Cousin, and thus, it should not have been penalized for something others failed to do.

We disagree. "Allowing inaccurate information back onto a credit report after deleting it because it is inaccurate is negligent." *Stevenson v. TRW Inc.*, 987 F.2d 288, 293 (5th Cir. 1993). Creditors report all magnetic tape data without notice of any kind. They do not highlight any particular data in their

14

magnetic tape submissions. Instead, it is incumbent on the consumer reporting agency to permanently delete and cloak the erroneous information. Trans Union knew about problems with re-reporting as Trans Union's own cloaking manual indicated that a process had to be developed to ensure that inaccurate information that was deleted did not keep reappearing. Trans Union offers no reason why, as a matter of law, cloaking for only twelve months is a reasonable procedure, especially when it could have easily cloaked any adverse information permanently and when its own witness conceded that in retrospect the twelve month cloaking procedure may have been unreasonable.[14] The fact that Experian, another of Trans Union's consumer reporting agency competitors, did not have a problem with ensuring the non-reappearance of, at least, the BellSouth account suggests the unreasonableness of Trans Union's procedure. Accordingly, Trans Union's cloaking procedure was not reasonable as a matter of law, and the issue of reasonableness was properly before the jury to consider.

Trans Union's final argument concerns whether the inaccurate information must have been published to a third party and that Cousin must have suffered a credit denial to establish a § 1681e(b) claim. In essence, that argument involves two interrelated legal elements--causation and injury--and charges that no injury flowed from the disclosures of the inaccurate information because they

---

[14]She partially retracted the statement later in the same deposition testimony that was admitted into the trial record.

15

were not publicized to a third party and that Cousin suffered no injury because there was no credit denial. Referring to various cases from this and other circuits, Trans Union insists that publication and denial of credit are prerequisites to a § 1681e(b) claim. *See*, *e.g.*, ***Pinner v. Schmidt***, 805 F.2d 1258, 1262 (5th Cir. 1986); ***Philbin v. Trans Union Corp.***, 101 F.3d 957 (3d Cir. 1996); ***Casella v. Equifax Credit Info. Servs.***, 56 F.3d 469 (2d Cir. 1995); ***Cahlin***, 936 F.2d 1151; ***Hauser v. Equifax, Inc.***, 602 F.2d 811 (8th Cir. 1979). *But see* ***Guimond v. Trans Union Credit Info. Co.***, 45 F.3d 1329, 1333 (9th Cir. 1995) (concluding that district court erred in predicating liability under § 1681e(b) on the occurrence of a credit denial or the transmission of a report to a third party). Because the January and February 1997 disclosures were sent to Cousin, rather than a third party, and because they did not contribute to a credit denial, Trans Union contends that those disclosures cannot support Cousin's claim for negligent noncompliance with § 1681e(b). As for the consumer report sent to Heafner in November 1996, Trans Union maintains that there was no evidence indicating that Heafner utilized the report to deny credit to Cousin.

We need not address Trans Union's specific arguments as to whether publication and denial of credit are necessary to assert a § 1681e(b) claim because even assuming arguendo that denial of credit and publication are not prerequisites for a § 1681e(b)

16

claim, we see insufficient evidence of actual damages to warrant the jury's award. As previously noted, § 1681o provides for actual damages when there has been negligent noncompliance with the FCRA. Here, the jury awarded $50,000 in compensatory damages and $4,470,000 in punitive damages. Those compensatory damages constituted the actual damages award and were apparently for Cousin's purported denial of credit by Heafner and for his emotional distress.[15] Trans Union contends that no compensatory damages should have been awarded for Cousin's failure to receive credit for the purchase of a vehicle because the credit grantor did not utilize a Trans Union credit report. It asserts that GMAC, not Heafner, denied Cousin credit and that GMAC used a report from Equifax and its own internal files. Additionally, Trans Union argues that the evidence did not support an award for Cousin's emotional distress.

Having reviewed the record, we agree. There was no legally sufficient evidence for a reasonable jury to find that a Trans Union credit report was utilized to deny Cousin credit. Three items purportedly supported the belief that Heafner denied Cousin

---

[15]Actual damages may include damages for humiliation or mental distress even if the consumer has suffered no out-of-pocket losses, as well as damages for injury to reputation and creditworthiness. *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir. 1983). No evidence about other actual damages was in the record. Cousin's attorneys did seek attorney's fees and costs, but those related to the filing of the instant action and were sought post-verdict pursuant to the attorney's fees provisions of the FCRA and the common law.

credit based on a Trans Union credit report.  One, a letter from

GMAC read:

> "We were recently informed by HEAFNER MOTORS, INC.
> that it was considering the credit sale or lease of
> an automobile or other product to you and asked
> whether we would be prepared to accept your
> obligation if the transaction was completed.  We
> must regretfully inform you that we were not
> agreeable to handling the proposed transaction."

Two, some testimony revealed that Heafner would have been noted as

the seller/creditor on the vehicle's installment sales contract.

Three, additional testimony indicated that Heafner assigns loans to

other entities after the sale of a car.  Although we are bound to

view the evidence and all reasonable inferences in the light most

favorable to the jury's determination, we cannot find that a

reasonable jury would have inferred from the foregoing evidence

that Heafner denied Cousin credit based on a Trans Union credit

report, particularly when the unequivocal testimony from Heafner

was that it does not grant credit to customers.[16]  The thrust of the

---

[16]The three items correspond to concerns with the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1667f.  That statute attempts to achieve the "informed use of credit results from an awareness of the cost thereof" by consumers by "mandating a meaningful disclosure of credit terms."  15 U.S.C. § 1601(a).  And it distinguishes between the responsibilities of creditors and assignees.  *See generally* **Riviere v. Banner Chevrolet, Inc.**, 184 F.3d 457, 460-61 (5th Cir. 1999).  Under the TILA, "[i]f an obligation is initially payable to one person, that person is the creditor *even if the obligation by its terms is simultaneously assigned to another person*."  **Id.** (quoting the staff interpretation to Regulation Z, 12 C.F.R. § 226).  The TILA recognizes that an automobile dealer and a bank may create an arrangement whereby the credit sale contracts are initially payable to the dealer but are immediately assignable to the bank.  **Id.**  In such cases, the dealer

18

evidence indicated that GMAC was the credit grantor and that it denied Cousin's application based on an internal credit report and a report from Equifax, not Trans Union. As the denial of credit was due to something other than Trans Union's consumer report on Cousin, we cannot justify the $50,000 compensatory damages award to include damages arising from that credit denial.

Accordingly, the only possible actual damages related to Cousin's emotional distress. The evidence of that distress, however, was very limited and legally insufficient. Cousin testified that as a result of the November 15, 1996 credit denial, he felt real frustrated and irritated because the BellSouth information was being re-reported.[17] At the time he felt emotional distress, he did not know whether a Trans Union report had been utilized by any of the parties. In light of the fact that the credit denial occurred due to an Equifax report, Cousin's emotional distress from the denial of credit cannot be attributed to Trans Union, and he cannot recover actual damages for that distress.

The only other testimony about emotional distress concerned

---

and purchaser execute the contract only after the bank approves the creditworthiness of the purchaser; yet, the dealer is deemed to be the only creditor in the transaction. *Id.* Heafner's arrangement with GMAC correlates to the TILA model.

[17]Cousin testified:
A:   On that day I felt real frustrated, real irritated to know that this information was continuing to be reported over and over again. I already told them that it was not me. I wanted to say that it was a feeling of like being in jail knowing that I - I mean, I didn't do this. I'm not guilty, but I was continuing to be punished for it.

Cousin's reaction to seeing his inaccurate Trans Union credit reports of November 15, 1996, and January 17, 1997.[18] Upon being questioned about how he felt when he saw the November 15, 1996 credit report, Cousin testified:

> A:  Very upset, angry.  And it just was that, you know, all things I had done, the company to not – they didn't hear me.  I had told them over and over again but they didn't listen to me, you know.  So that's how I felt.
>
> Q:  You felt like nobody was listening?
>
> A:  Felt like nobody was listening.

As for the January 17, 1997 disclosure, Cousin stated:

> A:  I felt like, if you [k]now anything about a maze, it's like being trapped inside of something that you can't get out of.

In *Carey v. Piphus*, 98 S. Ct. 1042, 1052 (1978), the Supreme Court required proof of actual injury for compensatory damages to be awarded for mental or emotional distress in an action brought under 42 U.S.C. § 1983.  It concluded that a jury's award for emotional distress must be supported by evidence of genuine injury, such as the evidence of the injured party's conduct and the observations of others.  *Id.* at n.20.  We extended *Carey*'s holding and reasoning to other cases involving federal claims for emotional harm in *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 938 (5th

---

[18]No testimony related to the February 1997 disclosure to Cousin, the April 9, 1997 disclosure to BellSouth, or the May 12, 1997 disclosure to GMAC.  Accordingly, no damages award may stand based on those arguably negligent acts.

Cir. 1996), a case concerning claims for racial discrimination and retaliatory discharge. There, we recognized that to establish intangible loss, *Carey* requires "a degree of specificity which may include corroborating testimony or medical or psychological evidence in support of the damage award. *Id.* at 940. In *Patterson*, we were confronted with the following evidence of emotional distress by one of the plaintiffs.

> [He] testified that he felt "frustrated" and "real bad" for being judged by the color of his skin. [He] explained that the work environment was "unbearable" and was "tearing [his] self-esteem down." [He] also stated that it "hurt" and made him "angry" and "paranoid" to know that his supervisor referred to [him] as a "porch monkey" or a "nigger" and generally though that he was inferior to white employees.

*Id.* at 939. That plaintiff's testimony was much more concrete than Cousin's; yet, we vacated the district court's $40,000 emotional distress award, finding that his testimony of mental distress was insufficient. *Id.* Because Cousin presented no more than what was offered in *Patterson*, we likewise vacate the award for emotional distress in the present case for insufficient evidence of actual damages.[19]

---

[19]Although in vacating the emotional distress award in *Patterson* we remanded the case to the district court with instructions for the district court to award nominal damages, "[n]ominal damages to vindicate a technical right cannot be recovered unless actual loss has occurred." *Hyde v. Hibernia Nat'l Bank*, 861 F.2d 446, 448 (5th Cir. 1988) (mentioning general rule about nominal damages in context of FCRA); Restatement (Second) of Torts § 907 cmt. a (1979) ("If actual damage is necessary to the cause of action, as in negligence, nominal damages are not awarded."); W. Page Keeton et

21

C.   Willful Noncompliance with the FCRA

Section 1681n[20] provides the statutory authority for civil liability for willful noncompliance with the FCRA.  As with his negligent noncompliance claim, Cousin's willful noncompliance claim pertains to Trans Union's failure to meet the requirements of § 1681e(b).  Under the willful noncompliance statute, a consumer may obtain punitive damages.  *See* 15 U.S.C. § 1681n(a)(2).  Here, the jury awarded $4,470,000 in punitive damages.

_____

al., Prosser and Keeton on Torts § 30, at 165 (5th ed. 1984). Here, in this negligent noncompliance action, there was insufficient evidence of actual loss.  Therefore, we need not award any nominal damages, and we make no determination as to whether Cousin has satisfied all the purported elements of a negligent noncompliance with § 1681e(b) claim to warrant nominal damages.

It is true that Cousin maintained a willful noncompliance claim and a claim for defamation with malice for which nominal damages could possibly be awarded, but both fail for other reasons.  *See infra* Parts C & D.

[20]That section provides in pertinent part:
Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
   (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or
      (B) . . .
   (2) such amount of punitive damages as the court may allow; and
   (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.
15 U.S.C. § 1681n(a).

22

"Malice or evil motive need not be established for a punitive damages award, but the violation must have been willful." *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir. 1983). In *Pinner*, we noted that "willful" is a word of many meanings and that its construction is often influenced by its context. *See Pinner*, 805 F.2d at 1263. In concluding that the consumer reporting agency in that case did not commit a willful violation, we remarked that there was no evidence suggesting that the agency "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Id.*; *see also Philbin*, 101 F.3d at 970; *Stevenson*, 987 F.2d at 293. Generally, courts have allowed a willful noncompliance claim to proceed where a defendant's conduct involves willful misrepresentations or concealments. *See Pinner*, 805 F.2d at 1263. In those cases, a consumer reporting agency has typically misrepresented or concealed some or all of a credit report from a consumer. *See id.* (discussing *Millstone v. O'Hanlon Reports, Inc.*, 528 F.2d 829 (8th Cir. 1976)); *see also Stevenson*, 987 F.2d at 294.

In its initial brief, Trans Union asserts two bases for rejecting Cousin's § 1681n claim. First, it argues that Cousin's § 1681n claim depended heavily on allegations that Trans Union willfully reinserted the GMAC tradeline into Cousin's consumer report in early 1997 and that judicial estoppel should have barred that claim from being asserted. Second, Trans Union maintains that

23

Cousin failed to present sufficient evidence of willfulness, comparing the instant situation to various other decisions involving far more egregious facts that were held insufficient to state a claim under § 1681n.

We need not address the first of Trans Union's arguments as Cousin essentially concedes in his response brief that Trans Union did not willfully dredge up the GMAC tradeline and reinsert it into Cousin's consumer report. Notwithstanding this apparent concession, Cousin challenges Trans Union's second argument that he failed to present sufficient evidence of willfulness. Cousin points to several facts, which apparently were brought forth at trial, to establish that Trans Union's actions constituted willful noncompliance. First, Cousin refers to the re-reporting of the BellSouth account in the November 15, 1996 report to Heafner despite the prior cloaking and the December 1995 notice from BellSouth to Trans Union confirming that the BellSouth information was subscription fraud. Second, Cousin argues that Trans Union knew about the problems of re-reporting but failed to do anything about it. He maintains that the company failed to adequately assess whether a twelve-month cloaking system would work. Third, Cousin complains of Trans Union's transmittal to BellSouth on April 9, 1997, a report including the fraudulent GMAC tradeline. Finally, Cousin raises the uncloaking of his consumer report on April 22, 1997, after the report had been cloaked on April 21, and

24

its transmission to GMAC.[21]  In its reply to Cousin's brief, Trans Union attempts to address Cousin's counter-arguments.[22]

At trial, Cousin introduced evidence that the BellSouth tradeline was fraudulent and that Trans Union had cloaked the account in March 1995.  Additional evidence indicated that in December 1995, BellSouth had submitted to Trans Union a UDF stating that the BellSouth account was probably subscription fraud.  Eleven

---

[21]Cousin also avers that Trans Union made misrepresentations to him when it sent a green postcard during the first Trans Union lawsuit in 1995, telling him that if the inaccurate information was ever reinstated after reverification, Trans Union would notify him. That allegation does not raise a § 1681n claim for violating § 1681e(b).  As noted in *Pinner*, the misrepresentations that might give rise to a willfulness claim normally concern misrepresentations of the consumer's own report and concealment of that report from the consumer.  *See Pinner*, 805 F.2d at 1263.

[22]Normally, "[a]n appellant abandons all issues not raised and argued in its *initial* brief on appeal."  *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994).  *But see Piney Woods Country Life School v. Shell Oil Co.*, 905 F.2d 840, 854 (5th Cir. 1990) (recognizing procedural bar about raising issues in initial brief, but still addressing as an exercise of discretion some issues newly raised in reply brief).  Although Trans Union's initial brief did not directly address some of the specific acts that may have formed the basis of the jury's § 1681n verdict and that Cousin discusses in his response brief, we believe that Trans Union's appeal questioning the evidentiary sufficiency of the willfulness claim sufficiently raised the issue of Trans Unions' willful conduct for us to consider all the arguments.  Indeed, Cousin's brief raising all the purported willful acts is a tacit acknowledgment that the general issue of willful conduct was presented in Trans Union's brief.  Furthermore, unlike the more contemptible situation where an appellant raises a completely new issue in its reply brief, disadvantaging the appellee, and for which the procedural bar concerning initial briefs was properly developed and utilized, we see no real new issue in the reply brief, but rather responsive arguments to the appellee's own contentions, and, therefore, little or no prejudice.  With that in mind, we review the sufficiency of the willfulness claim.

25

months later, the BellSouth tradeline reappeared in Cousin's file. Testimony indicated that BellSouth may have re-reported the adverse tradeline information to Trans Union between April 1996 and August 1996. The prior lawsuit, the cloaking of the BellSouth account, and BellSouth's own UDF transmittal may have put Trans Union on notice about the falsity of the BellSouth account with respect to Cousin; nevertheless, we cannot conclude that such evidence is legally sufficient to establish that Trans Union willfully violated § 1681e(b). In *Philbin*, the Third Circuit found no willful violation despite the reappearance of inaccurate information that had previously been deleted and which the consumer had again notified the consumer reporting agency about when that information reappeared. *See id.; see also Casella*, 56 F.3d at 476 (failing to delete inaccurate information notwithstanding notification to consumer reporting agency did not rise to the level of conscious disregard or deliberate and purposeful action necessary to make out a willful noncompliance claim). The present situation is no more egregious than in *Philbin* or *Casella*. The fact that Trans Union may have had experience with Cousin's BellSouth tradeline and that BellSouth had submitted a UDF to Trans Union about subscription fraud does not necessarily translate into knowingly and intentionally committing an act in conscious disregard of Cousin's rights. BellSouth itself appears to have reinserted the information, and several months had elapsed from the time of the

26

UDF and/or the initial cloaking to the reinsertion of the BellSouth tradeline into Cousin's file. Finally, Trans Union did not conceal Cousin's consumer reports or misrepresent them. That in and of itself suggests that Trans Union did not commit a willful violation of § 1681e(b). *Stevenson*, 987 F.2d at 294 ("Only defendants who engaged in 'willful misrepresentations or concealments' have committed a willful violation and are subject to punitive damages under § 1681n.").

Similarly, we find Cousin's argument with respect to Trans Union's failure to implement a better cloaking system unavailing. The system was not perfect, but it was effective for a few months, and Trans Union never attempted to mislead Cousin with respect to his consumer report or his rights. We may fault the failure to implement a full-proof cloaking procedure as unreasonable, but we cannot say that it was willful.

As for Trans Union's disclosure of Cousin's consumer reports to BellSouth in April 1997 and to GMAC in May 1997, we first note the evidence at trial and the parties' admissions. When on January 17, 1997, after having been denied credit to purchase a car from Heafner, Cousin received a Trans Union report, the report included the false Aberdeen address and the BellSouth tradeline. Cousin immediately notified Trans Union that those entries were false, and Trans Union deleted them. At that time, however, GMAC submitted to Trans Union, as much of the evidence indicates and as Cousin now

27

apparently concedes, the old GMAC tradeline that had previously been deleted from Cousin's report.  But GMAC utilized a different prefix code to identify the tradeline rather than the old one. Cousin notified Trans Union about the fraudulent nature of the GMAC tradeline on March 4, 1997.  That tradeline was later released in a consumer report to BellSouth on April 9, 1997.  On April 21, 1997, the record reveals that Cousin's file was cloaked.  That cloak was short-lived as it was uncloaked the next day. Thereafter, on May 12, 1997, Cousin's consumer report with the fraudulent GMAC tradeline was transmitted to GMAC.

Although the consumer reports to BellSouth and to GMAC contained inaccurate information about the GMAC tradeline, we do not believe that those or any other acts amount to legally sufficient evidence for a reasonable jury to find for Cousin on his § 1681n claim for violation of § 1681e(b).  The GMAC tradeline had a new prefix code and, in essence, was not the same as before.  We cannot deem as a willful violation Trans Union's inability to distinguish two tradelines that on their face were different. Thus, Trans Union's failure to quickly delete the GMAC tradeline and its decision to release a consumer report with that information while it reinvestigated the tradeline cannot be deemed a willful violation of § 1681e(b).  *See* 15 U.S.C. § 1681i (providing reinvestigation procedure in case of disputed accuracy).

Cousin makes much of the fact that Trans Union cloaked his

28

file on April 21 with notations stating "ID FRAUD" and "derogs" and then uncloaked the file the next day.  He argues that the uncloaking demonstrates willfulness because the evidence showed that only a Trans Union supervisor could have manually uncloaked his file.  Thus, Cousin believes that Trans Union must have intended for the GMAC tradeline to be in his file.  Even if a Trans Union supervisor had uncloaked Cousin's file, we conclude that such an act did not constitute a willful violation of § 1681e(b).  As the testimony indicated, cloaking is a process whereby Trans Union precludes future submissions of inaccurate tradeline information from being entered into a consumer's file.  Cloaking does not concern the actual deletion of any inaccurate information.  Hence, when Trans Union determined to uncloak Cousin's file, it did not actually do anything substantively to his file.  Rather, Trans Union allowed the status quo to stand while it reinvestigated the fraudulent nature of the GMAC tradeline.  Consequently, we see no willful violation of § 1681e(b) under the evidence presented to the jury.[23]

D.   Defamation With Malice

Cousin's last claim is a common law action for defamation with malice.   Under § 1681h(e), consumer reporting agencies are generally qualifiedly immune from state law claims for defamation

---

[23]In making this ruling, we again make no determination as to whether publication and denial of credit are prerequisites for a claim predicated on § 1681e(b).

29

unless they involve malice or willful intent to injure. Both Trans Union and Cousin agree that courts have determined that malice under this statutory scheme is congruent with the common law standard. *See Thornton v. Equifax*, 619 F.2d 700, 703 (8th Cir. 1980). Thus, to establish defamation with malice in the present case, one must establish that the defendant when he published the words--(1) either knew they were false, or (2) published them in reckless disregard of whether they were true or not. *See Gulf Publishing Co. v. Lee*, 434 So. 2d 687, 695 (Miss. 1983) (citing *Reaves v. Foster*, 200 So. 2d 453, 458-59 (Miss. 1967)).

In the instant case, there were three disclosures to outside parties: 1) the report to Heafner Motors with the BellSouth tradeline and the fraudulent Aberdeen address on November 15, 1996; 2) the report to BellSouth with the GMAC tradeline on April 9, 1997; and 3) the report to GMAC with the GMAC tradeline on May 12, 1997. None of those disclosures amounted to defamation with malice.

As previously indicated, after learning of the fraudulent nature of the BellSouth tradeline, Trans Union had cloaked the BellSouth tradeline in March 1995. Pursuant to that procedure, that information was not reported in Cousin's file for at least a year and was not publicized to another party until November 1996. Only after BellSouth had apparently begun re-reporting that tradeline did it get back into Cousin's file. The lack of

30

permanence with the cloaking procedure may evidence the weakness and unreasonableness of the procedure, but no malice can be derived from it.

Likewise, we see no legally sufficient evidentiary basis for concluding that Trans Union defamed with malice when it transmitted the GMAC tradeline to BellSouth and to GMAC itself. GMAC had re-reported the tradeline, utilizing a different prefix code. Although in March 1997 Cousin had notified Trans Union about the fraudulent nature of that tradeline, we cannot say that Trans Union knew that the tradeline was false when the evidence revealed that the tradeline had been re-reported with a different prefix code and that Trans Union was reinvestigating that tradeline. Trans Union's subsequent actions do not suggest a reckless disregard for the truth. It promptly corrected any errors and fully disclosed its reports to Cousin. Therefore, we find that there was legally insufficient evidence to support Cousin's defamation with malice claim.[24]

---

[24]We also note that in **Thornton**, the Eighth Circuit held that the standard of proof required for a claim under the exception to the qualified immunity provision of § 1681h(e) is greater than that for a willful violation claim under § 1681n. **Thornton**, 619 F.2d at 705. Assuming that were the case, we would have to find against the defamation with malice claim in light of our previous determination that there was no legally sufficient evidence to support a willfulness violation under § 1681n.

### III. CONCLUSION

For the foregoing reasons, we vacate the district court's judgment and render that Cousin taken nothing with respect to his claims.[25]  Each party is to bear their respective costs on appeal.

<span style="color:red">ENDRECORD</span>

---

[25]In light of our ruling, we do not address Trans Union's argument, in the alternative, regarding remittitur or a new trial.

ROBERT M. PARKER, Circuit Judge, dissenting:

Because the evidence, taken in the light most favorable to the jury verdict, supports that verdict, I respectfully dissent. "Our assigned role is neither to re-try the case *de novo* nor to supplant the jury verdict so long as it is supported by substantial evidence." *Pinner v. Schmidt*, 805 F.2d 1258 (5th Cir. 1986).

I agree that with the majority that Trans Union's cloaking procedure cannot be held reasonable as a matter of law and that the issue of reasonableness was properly submitted to the jury. However, I would hold that the evidence of actual damages was sufficient to warrant the jury's award of $50,000. Actual damages may include out-of-pocket losses, damages for injury to reputation and creditworthiness and for humiliation or mental distress. *See Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 151 (5th Cir. 1983). Cousin and his attorney, over a four-and-one-half year period, repeatedly advised Trans Union that specific derogatory credit information in its files was inaccurate. Cousin commenced two successive federal lawsuits in an effort to obtain Trans Union's compliance with the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681u. Moreover, Cousin testified concerning his mental and emotional pain arising from the ongoing struggle. The jury's conclusion that Cousin suffered actual financial and emotional damages was entirely reasonable in light of the evidence

33

presented at trial.

Further, I conclude that the evidence supports the jury's punitive damage award of one percent of Trans Union's net worth. Cousin presented evidence of Trans Union's willful noncompliance with 15 U.S.C. § 1681e(b)'s requirement that a credit reporting agency shall follow reasonable procedures to assure maximum possible accuracy of credit information. Again, the majority does not find as a matter of law that Trans Union complied with the reasonableness requirement of FCRA. Rather, it reverses the jury verdict on the basis that the evidence was insufficient for the jury to conclude that its noncompliance was willful. I disagree. At the heart of our inquiry lies Trans Union's policy of limiting its cloaking of erroneous information to one year. The evidence was more than sufficient for a jury to conclude that Trans Union was aware that one-year cloaking limit was inadequate, and that it could have addressed the problem by implementing permanent cloaking procedures. Further, Trans Union knew, after years of repeated complaints and a prior lawsuit, that Cousin's file had been the target of "ID FRAUD," yet the majority holds that a reasonable juror could not conclude that the decision to uncloak the file and release a consumer report while it reinvestigated yet another complaint was a willful violation of its duty to behave reasonably. In short, both Trans Union's general cloaking policy and its specific handling of Cousin's file support the jury's finding of willful noncompliance.

34

Based on the foregoing, I would affirm the verdict for Cousin *in toto.*