Penny Lee ANDERSON and Russell
D. Anderson, Sr., Plaintiffs,

v.

TRANS UNION LLC., Experian Information Solutions, Inc.; CSC Credit Services, Inc.; and Equifax, Inc., d/b/a Equifax Information Services, LLC., Defendants.

No. 03–C–0510–C.

United States District Court,
W.D. Wisconsin.

May 3, 2005.

Thomas Lyons, Thomas Lyons & Associates P.A., Little Canada, MN, for Plaintiffs.

Ian A.J. Pitz, Michael Best & Friedrich, Llp, Madison, WI, for Trans Union, L.L.C.

G. John Cento, Katz & Korin, P.C., Indianapolis, IN, for Trans Union, L.L.C.

Erik J. Girvan, Faegre & Benson, Minneapolis, MN, for CSC Credit Services, Inc.

Lewis P. Perling, Kilpatrick Stockton LLP, Atlanta, GA, for Equifax Information Services LLC, Equifax, Inc.

## OPINION AND ORDER

CRABB, District Judge.

Only two matters remain in this civil action brought under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681u, against a number of defendants, all of whom have been dismissed from the case with the exception of defendant Trans Union, LLC. (All further references to "defendant" will be to Trans Union.) One matter is defendant's supplemental motion

for summary judgment, in which it maintains it is entitled to judgment in its favor on plaintiffs Penny Lee Anderson's and Russell D. Anderson, Sr.'s claims that defendant violated § 1681i by failing to conduct proper reinvestigations of their complaints and reinserting misinformation into their consumer reports and that it violated § 1681e(b) when it prepared consumer reports containing the false notations that plaintiffs were deceased after it had been put on notice that the notations were inaccurate. The second is defendant's motion to strike any facts proposed by plaintiffs that are based upon depositions taken in an arbitration proceeding from which defendant's counsel was excluded. Plaintiffs' claims arise out of an erroneous entry in plaintiffs' credit information by Cross Country Bank, the issuer of their credit card. This entry was imported into credit reports that defendant kept on plaintiffs, causing the reports to show plaintiffs as "deceased." After plaintiffs brought it to defendant's attention, defendant investigated and removed the entry. Despite defendant's attempt to cure the problem the erroneous entry re-appeared the reports when Cross Country Bank changed plaintiffs' credit card from MasterCard to Visa and imported the same erroneous notation of "deceased" into the new account. It was not until after this lawsuit was filed that Cross Country Bank finally determined the cause of the inaccurate notation of deceased and ceased reporting it to defendant. Before then, however, the bank had notified defendant of the error in the Visa account and defendant had deleted it from its credit reports, although not without initial difficulty in making the deletion complete.

In an order entered on November 24, 2004, I granted defendant summary judgment on plaintiffs' claim that its faulty credit report caused Ameriquest to deny plaintiffs' application for credit. Plaintiffs moved for reconsideration of that decision.

I denied the motion in an order entered on March 8, 2005, and gave the parties an opportunity for limited discovery and supplemental briefing on plaintiffs' claims involving violations of § 1681i and § 1681e(b).

Now that the additional discovery and supplemental briefing have been completed, I conclude that plaintiffs have not shown that they have sufficient evidence to support their contention that defendant violated the Fair Credit Reporting Act. No reasonable jury could find that defendant violated any of its obligations to plaintiffs under §§ 1681i or 1681e(b). The deceased notation was an unusual error by the bank, which was otherwise a reliable furnisher of credit information, and the nature of the error eluded the usual forms of suppression and correction in defendant's system. The error's persistence and reappearance in plaintiffs' credit reports cannot be attributed to defendant's failure to have reasonable procedures in place. As to defendant's reinvestigations, defendant met its statutory obligations.

Before setting out the undisputed facts, I note that in some instances defendant has supported its proposed findings with citations to findings relating to former defendant CSC that were found as fact made in the November 24 opinion, which focused primarily on the claims against the other entities named in this lawsuit. Plaintiffs have objected to this procedure, pointing out that those findings were limited to defendant CSC. A review of defendant's proposals show that the findings to which plaintiffs object are primarily background facts that put the lawsuit into context. Plaintiffs have had two full opportunities to attempt to put the proposals into dispute, once in this phase of the proceedings and once when CSC proposed the facts. Accordingly, I will treat the proposed facts

taken from the November 24 as no different from any other proposed facts.

I will grant defendant's motion to strike the facts proposed by plaintiffs that are based upon information that plaintiffs learned as the result of depositions taken during their arbitration proceedings with Cross Country Bank. Plaintiffs did not give defendant notice of the depositions, presumably because counsel for the deponents advised the parties that defendant would not be allowed to participate in the depositions. After plaintiffs advised all parties in writing that the same depositions would have to be taken again in this case, defendant wrote to plaintiffs' counsel to seek confirmation in writing that the depositions taken for use in the arbitration proceeding would be used solely in that arbitration and that plaintiffs did not intend to utilize them in any way in this case. Plaintiffs' counsel acknowledged by email that the depositions would not be used against defendant in this case.

Despite this acknowledgment, plaintiffs' counsel is trying to use the depositions against defendant. The attempt will not be allowed. It would not be fair to defendant to allow plaintiffs to cite testimony from depositions taken outside defendant's presence.

From the findings of fact proposed properly by the parties, I find that the following are material and undisputed.

## UNDISPUTED FACTS

Plaintiffs Penny Lee Anderson and Russell D. Anderson, Sr. are husband and wife. Neither was deceased at the time relevant to this suit. Defendant Trans Union, LLC is a consumer reporting agency that collects credit information furnished to it by various sources including creditors, insurers, employers, landlords, banks and doctors, who are referred to as "furnishers" within the credit reporting industry.

### A. *Defendant's Procedures*

Defendant collects information from more than 85,000 furnishers and maintains credit files on approximately 200,000,000 consumers, including plaintiffs. The collection process is largely electronic and is designed to insure the greatest level of uniformity and accuracy. Defendant's contracts with its furnishers require them to report accurately.

Before entering into a contractual relationship with a furnisher such as Cross Country Bank, defendant does an initial site inspection and reviews due diligence investigation information to assure itself that the furnisher is a creditworthy financial institution.

When a furnisher first becomes a subscriber, defendant spends some time with the furnisher to make sure that it is furnishing information accurately. Defendant advises the furnisher of the tradelines defendant has received from the customer that show "conditions" such as "in bankruptcy" or "deceased" and asks the furnisher to sign off on the information as being accurate or not. In this way, defendant makes sure that the furnisher is confirming the date it is providing to defendant, since it is the furnisher that has a relationship with the consumer and is the best position to confirm the data. Defendant does not perform an independent verification of the information.

Defendant has in place procedures and quality checks for reliability, including audits. Defendant either distributes instruction manuals to its customers or makes sure that they have access to such manuals.

Defendant has a system in place to alert it when a customer reports a condition above a threshold level as measured against prior reporting. When alerted, defendant investigates the furnisher and the

information it is providing to be sure that the furnisher has no program or system errors. Defendant tries to conduct annual audits of the information provided by its furnishers. The audit check relies on samples of between 5 to 1500 examples of every type of condition reported by a furnisher. The furnisher is asked to review the samples and tell defendant whether the reporting is accurate and whether defendant has read and translated the information to a tradeline accurately.

Defendant keeps a record of the number of disputes it receives from consumers about a particular furnisher as a means of alerting it to problems. If it becomes aware that a furnisher is providing inaccurate data, it takes action immediately and removes the disputed information until satisfied that it can rely on the furnisher's data. From its experience with Cross Country Bank, defendant has found the bank to be a reliable source of credit information and unlikely to report inaccurate information except in isolated instances.

Furnishers provide information to defendant using coding tapes transmitted on a monthly basis. Each month they submit approximately 22,000,000,000 records. Defendant processes these records electronically, matching the credit information with a particular credit file, using a set of algorithms or logic programs.

To report a consumer as deceased, the furnisher sends a code of "X" in the ECOA Code field of its coded tapes. (Neither side has advised the court what ECOA means.) At present, defendant is maintaining more than 5,000,000 tradelines that are reporting a "deceased" code.

In defendant's experience, it is not unusual for deceased consumers to have accounts that appear to be active. Transactions may not be reconciled until after the consumer has died; a spouse or personal representative may be paying off the decedent's debts or incurring new ones on the account. If defendant were required to notify consumers that one creditor has reported them deceased, defendant would incur substantial costs, primarily because the notification could not be done electronically.

Defendant has implemented procedures to conduct reinvestigations of disputes. Generally, when defendant receives notice of a dispute from a consumer, it investigates the dispute using one of two systems developed for the purpose of tracking and processing disputes: the Consumer Dispute Verification process and the Automated Consumer Dispute Verification process. Through the automated dispute process, defendant asks the furnisher electronically to verify that the "indicative" information on the consumer matches the indicative information maintained in the furnisher's records and is associated with the particular account in dispute. Defendant asks the furnisher to verify the accuracy of the account information it is reporting to defendant, such as account balance, payment history and credit limit. If the furnisher verifies the reported information, defendant updates the information on the consumer's credit file and notifies the consumer of the verification. If the furnisher reports that the information is inaccurate or that specific items can no longer be verified or if the furnisher fails to respond within the required time, defendant deletes the information from the consumer's credit file and notifies the consumer of the deletion. Depending on the nature of the dispute and the circumstances of the case, defendant may employ additional or different procedures for processing a dispute.

When defendant provides notification to the consumer, it gives him an opportunity to have a 100–word statement inserted in his file regarding the information and will assist him in writing such a statement.

Defendant recommends to consumers that they should not apply for credit while a dispute is pending, because the results of the reinvestigation may affect a new credit decision.

### B. *Cross Country Bank's Notation of Deceased*

Sometime in 1999, plaintiffs opened a MasterCard account with Cross Country Bank, which is a furnisher of credit information to defendant. Sometime thereafter, plaintiffs' address changed because their street had been renamed. For some reason, an employee at Cross Country Bank followed a non-standard procedure and set a flag on plaintiffs' account that produced a faulty notation of deceased. The bank did not know that the flag had been set or that it was causing plaintiffs to be reported as deceased. It would have learned about the flag only if it had reviewed its "credit dump reports," where it might have seen a flag halfway down the middle column of the report with the notation: "CHD deceased flag—B."

Without realizing the problem with the flag, the bank reported misinformation about plaintiffs' account to consumer reporting agencies. The problem was exacerbated in May 2002, when the bank converted plaintiffs' MasterCard account to a Visa account. The bank's computer system viewed the Visa account as a continuation of the MasterCard account and imported the erroneous flag into the new account.

So long as the bank remained unaware of the existence of the flag and did not take steps to remove it, it showed up on the tapes sent to defendant. Even when the bank tried to change the status of plaintiffs' account from deceased to joint or individual in response to inquiries or instructions to update the account, the tapes continued to show a notation of deceased. It was not until plaintiffs initiated this suit that the bank undertook an internal investigation that uncovered the existence of the flag. During this entire time, the bank's internal view of plaintiffs' accounts was that they were in good standing.

Plaintiff Russell Anderson gave defendant its first notice of a dispute involving a notation of deceased on his Cross Country Bank MasterCard account when he telephoned defendant on August 8, 2000. At the time, the bank was reporting plaintiffs' MasterCard account to defendant under the subscriber number defendant had assigned to the bank. In response, defendant sent plaintiff Russell Anderson a copy of his consumer disclosure that contained the following information about the MasterCard account that Cross Country Bank was reporting to defendant:

```
CROSS COUNTRY BANK XXXX–XXXX–XXX–3912
DECEASED CREDIT CARD
UPDATED 06/2000 MOST OWED: $210 PAY TERMS: MINIMUM $35
CREDIT LIMIT: $900
STATUS AS OF 06/2000: PAID OR PAYING AS AGREED
IN PRIOR 23 MONTHS FROM LAST UPDATE NEVER LATE
```

On August 9, 2000, defendant sent Cross Country Bank an Automated Credit Dispute Verification to initiate an investigation into the accuracy of the "deceased" codes that were showing up on plaintiff Russell Anderson's MasterCard account. The bank failed to return the verification. Therefore, on September 6, 2000, defendant concluded its reinvestigation and "cloaked" the MasterCard account. The "cloaking" consisted of deleting the information permanently from a publicly avail-

able consumer report, while at the same time tracking the account to insure that the account did not appear on a credit report if the furnisher continued to provide electronic update information on the account. If defendant removed the account from its records entirely, regular tape reporting by Cross Country Bank would have the effect of reinserting the account into the credit report.

Also on September 6, 2000, defendant sent plaintiff Russell Anderson his consumer disclosure dated September 6, 2000, along with the results of the investigation, showing that the MasterCard account had been "deleted." Defendant never reported the MasterCard account again on any consumer report.

At some time between September 2000 and May 2002, Cross Country Bank converted plaintiffs' MasterCard account to a Visa account. Starting in May 2002, the bank began reporting plaintiffs' Visa account to defendant, using a different account number and subscriber number from the account number and subscriber number that defendant's system associated with the MasterCard account. Because of the different numbers, the Visa account eluded defendant's cloaking mechanism and showed up in defendant's consumer files with notations of "consumer deceased."

On November 6, 2002, defendant learned for the first time that the Visa account showed plaintiffs as deceased when plaintiff Penny Anderson wrote to ask for an investigation into erroneous information on the account that was showing up on their credit report. On November 13, 2002, the Visa account contained the following information that Cross Country Bank had reported to defendant:

CROSS COUNTRY BANK XXXX–XXXX–XXX–6736 REVOLVING ACCOUNT
DECEASED CREDIT CARD
UPDATED 10/2002 BALANCE $1847 CONSUMER DECEASED
OPENED 04/1999 MOST OWED: $1959 PAY TERMS: MINIMUM $56
CREDIT LIMIT: $1900
STATUS AS OF 10/2002: PAID OR PAYING AS AGREED
IN PRIOR 28 MONTHS FROM LAST UPDATE NEVER LATE

On November 13, 2002, defendant initiated a reinvestigation into the accuracy of the deceased information on the Visa account by sending an Automated Credit Dispute Verification to Cross Country Bank. In the verification was a Remark Field that read "DECEASED" and the ECOA Code containing the code "X," which stands for "Consumer Deceased." On November 26, 2002, the bank returned the verification to defendant, confirming the accuracy of plaintiff Russell Anderson's first and last name, address and social security number. Although the bank put an X next to the notation of deceased on the verification form, indicating that the remark was erroneous, it also wrote "Verified as Reported" on the form. Under the form's conventions, the statement overrode the "X." On November 26, 2002, defendant mailed plaintiff Russell Anderson the results of the reinvestigation and a copy of his consumer disclosure dated the same day.

On January 7, 2003, plaintiff Russell Anderson telephoned defendant on plaintiff Penny Anderson's behalf, saying that he was going to fax a letter to defendant that he had received from Cross Country Bank. That same day, defendant initiated an investigation into the Visa account by sending an Automated Credit Dispute Verification to Cross Country Bank. On January 8, 2003, before the investigation could

be completed, defendant received faxed correspondence from plaintiff Penny Anderson attaching letter from Cross Country Bank, which read in pertinent part as follows:

We have received your correspondence concerning the information appearing on your credit report. Due to our system conversion, your MasterCard account was reassigned to the above Visa Account. All pertinent information regarding your account remains unchanged, however refer to the new account number in future correspondence. As a result of this issue, we have submitted a request to the credit bureaus for removal of the account XXX–XXXX–XXX–XXX–2260 entirely. In addition, account XXXX–XXXX–XXX–XXX 6736 has been updated and the deceased status removed. Please allow 30–60 days for the credit bureaus to update their records. We apologize for any inconvenience this may have cause[d] and trust we have satisfactorily addressed your concerns.

Defendant accepted this correspondence without further investigation. On January 13, 2003, it attempted to remove the deceased notation from the Visa account by removing the word deceased from the Remark Field. However, the correction did not take effect because the operator failed to update the ECOA field as well. Defendant decided that it was not necessary to cloak the account because the correspondence from Cross Country Bank showed that the bank had updated its records. That same day, defendant mailed investigation results to plaintiff Russell Anderson along with his consumer disclosure. On January 20, 2003, plaintiffs called defendant's consumer contact department to inform it that the deceased status on the Visa account remained unchanged on the January 13, 2003 disclosure. The operator who took the call realized that the previous operator who had processed plaintiff Russell Anderson's January 8, 2003 dispute had failed to change the ECOA code. The operator proceeded to remove the codes from both the Remarks Field and the ECOA code field. On the same day, defendant sent plaintiff a copy of his current disclosure showing that the Visa account was reflected accurately in his credit file.

## OPINION

### A. § 1681i Violations

1. *Section 1681i(a)—failure to conduct proper reinvestigations*

██ Section 1681i(a) requires a consumer reporting agency to reinvestigate the completeness or accuracy of any item of information contained in a consumer's file if the agency receives notice from the consumer that he is disputing the item. The statute does not prescribe the manner in which the reinvestigation is to be carried out. Arguing that defendant's reinvestigations did not comply with the intent of the statute, plaintiffs cite cases in which courts have held that reinvestigations are inadequate if they merely shift the burden back to the consumer and the credit grantor or do not show that the actions the agency has taken are adequate under the circumstances. *E.g., Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir.1997) (when consumer reported possibility that someone had obtained credit cards in her name and was using them fraudulently, statute required more of consumer reporting agency than simply confirming with card issuers that cards had been issued in consumer's name); *Henson v. CSC Credit Services*, 29 F.3d 280, 286 (7th Cir.1994) (holding that after consumer reporting agency receives notice that report of judgment against consumer may be inaccurate, it has duty to look beyond reporting of judgment, although it has no such duty prior to receipt of notice); *Stevenson v.*

*TRW Inc.,* 987 F.2d 288, 293 (5th Cir.1993) (upholding jury finding that consumer reporting agency violated § 1681i when it relied solely on Consumer Dispute Verification forms in conducting investigation despite large number of disputed accounts and allegations of fraud). Plaintiffs rely on these cases in arguing that the reasonableness of a particular § 1681i investigation is usually a question that must be left to the jury to determine.

The cases plaintiff cites recognize the possibility that reinvestigations need to go beyond the original source in certain situations. In *Cushman,* it was not enough for the defendant to find out that the cards had been issued; the consumers were not complaining that the cards had not been issued but that their cards were being used fraudulently. In *Henson,* it was not enough to check the court record; the complaint was that the record was inaccurate. In *Stevenson,* it was not enough to rely on the usual reinvestigation procedures when the complaint concerned fraud and there were many disputed accounts. In plaintiffs' case, however, the question is simply whether the plaintiffs are alive. This is something that the credit card issuer (Cross Country Bank) can be depended upon to verify; it has the means of checking its cardholders' status and it certainly has the motivation to do so. If someone is using credit cards of a person who is deceased, who has a stronger reason to check the legitimacy of such use but the issuer who may be held liable for any fraudulent charges?

It is not necessary to hold a trial on the reasonableness of defendant's reinvestigation of plaintiffs' complaints. No reasonable jury could find that when defendant followed the procedure set out in subsection (a)(2) of § 1681i, which requires a consumer reporting agency to "provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person," it was ignoring its reinvestigation duty. Once it gave notice of the dispute to Cross Country Bank, the creditor that had supplied the disputed item of information, it became Cross Country Bank's duty to determine whether plaintiffs had died and to report back to defendant. Although plaintiffs assert that an "unreliable source obviously cannot be relied upon to identify its own unreliability," Plts.' Supp. Mem. of Law, dkt. # 125, at 3, they have not shown that defendant had cause to believe that the bank was an unreliable source that could not be relied upon for an accurate report of its own cardholders. The only evidence they cite is the evidence of the bank's mistakes in this case. It should go without saying that no one can rely solely on the occurrence of a mistake to argue that the mistake could have been anticipated.

■ Plaintiffs assert that defendant violated the statute by not sending a notice of a dispute to Cross Country Bank regarding Russell Anderson's January 7, 2003 dispute, Penny Anderson's and Russell Anderson's January 8, 2003 disputes or plaintiffs' January 20, 2003 dispute; in other words, defendant was remiss in not initiating reinvestigations every time it heard from plaintiffs. In fact, defendant did initiate a reinvestigation on January 7, when it received the call from Russell Anderson on his wife's behalf, saying that he was going to fax a letter the next day from Cross Country Bank. It did not pursue that reinvestigation or begin a new one once it read the fax and the attached letter from the bank, acknowledging the error, informing plaintiffs that it had removed the notation of deceased from their Visa account and apologizing for the inconvenience the error had caused them. Instead of reinvestigating, defendant proceeded immediately to remove the notation from

the Cross Country Bank tradelines in plaintiffs' credit reports. Unfortunately, defendant's employee did not handle the removal properly and it showed up once more before another employee removed it permanently on receipt of a call from Penny Anderson on January 20, 2003.

Plaintiffs characterize the January 20 call as another dispute that triggered defendant's obligation to undertake a reinvestigation, because defendant had told plaintiffs on January 13, 2003 that it had completed its reinvestigation. Again, this is a misstatement of the circumstances. No reinvestigation was necessary on January 20. Defendant knew by then that plaintiffs were not deceased; it did not need to go back to Cross Country Bank to find that out. All it needed to do was to remove the notation of deceased from plaintiffs' reports. It accomplished that while plaintiff Penny Anderson was still on the telephone.

2. *Section 1681i(a)(2)(A)—vagueness of notice*

■ Section 1681i(a)(2)(A) requires consumer reporting agencies to give a furnisher "all relevant information regarding the dispute that the agency has received from the consumer." Plaintiffs contend that the reinvestigations that defendant carried out in August and September 2000 and November 2002 were inadequate because the Automated Credit Dispute Verification form defendant sent to Cross County Bank was vague and did not notify the bank of the specific dispute that plaintiffs had with defendant. However, plaintiffs have cited no evidence to support their allegation that the code language that defendant used in the November 2002 form did not notify the bank that "Someone claims the Andersons are not dead."

Plaintiffs seem to think that they do not need to produce direct evidence of the bank's inability to understand the coded language. Instead, they argue that a jury could draw this inference from the bank's failure to do an adequate investigation. If this is their reasoning, they are wrong. It would be sheer speculation to conclude from one mistake that the cause of the mistake was a misunderstanding of the code language and not any number of other possible causes.

Defendant complied with the Act's notice requirement when it forwarded to Cross Country Bank the information that plaintiffs were disputing the notation of deceased in defendant's credit report. Plaintiffs cannot prevail on their claim under this subsection of § 1681i.

3. *Section 1681i(a)(4)—failing to review all relevant information*

■ Subsection (a)(4) of § 1681i requires consumer reporting agencies to "review and consider all relevant information submitted by the consumer . . ." when conducting a reinvestigation. Plaintiffs argue that defendant violated this provision when it disregarded plaintiffs' written insistence (in plaintiff Penny Anderson's November 6, 2002 letter) that they were alive. Apparently, plaintiffs believe that the Act required defendant to accept Penny Anderson's letter. The statute imposes no such requirement. The quoted language provides the the agency is to "review and consider" the information; it does not say that the agency must accept it at face value. Defendant did consider the letter, as shown by its immediate transmission of an Automated Credit Dispute Verification form to Cross Country Bank.

Good reasons exist for the Act's failure to require a consumer reporting agency to accept representations made in a letter from a consumer advising it of a dispute. Agencies have no mechanisms for auditing the reliability and truthfulness of consumers. Requiring them to accept and rely

upon information in letters from consumers would be an invitation to fraud. The Act takes this into account in directing agencies to *"review* and *consider"* the consumer's information, § 1681i(a) (emphasis added), without requiring the agencies to accept it as accurate.

4. *Section 1681i(a)(5)(A)—failing to delete inaccurate information*

In yet another effort to establish a violation of the Act, plaintiffs argue that defendant failed to delete or modify inaccurate information once it knew in November 2002 that the deceased notation on plaintiffs' Visa account was incorrect. In fact, defendant did not "know" that the notation was incorrect at that time; all it knew was that plaintiffs were contesting the notation. (Knowing that another account of plaintiffs' had shown an incorrect notation of deceased in the past did not require defendant to delete the deceased notation in the Visa account without investigating the accuracy of plaintiffs' complaint. Plaintiffs could have died in the interval.) Defendant undertook an immediate reinvestigation but Cross Country Bank filled out the form improperly, indicating to defendant that the notation was accurate. It was not until January 8, 2003, that defendant learned that the notation was not accurate; at that time, it acted immediately to correct its records. Unfortunately, the operator erred in making the correction and it did not take effect. Twelve days later, when plaintiff Russell Anderson called to complain, defendant made the proper correction.

 Although plaintiffs take the position that these mistakes are clear evidence of defendant's liability for violations of the Fair Credit Reporting Act, the Act is not a strict liability statute. *Sarver v. Experian Information Solutions,* 390 F.3d 969, 971 (7th Cir.2004) (citing *Henson v. CSC Credit Services,* 29 F.3d 280, 284 (7th Cir.1994))

(Act "'does not make reporting agencies strictly liable for all inaccuracies'") (quoting *Cahlin v. General Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir.1991)). A consumer reporting agency's obligation under the Act is to employ *reasonable* procedures, not perfect ones. 15 U.S.C. § 1681(b); § 1681i(a)(5)(C); *Sarver,* 390 F.3d at 972 ("given the complexity of the [consumer credit reporting] system and the volume of information involved, a mistake does not render the procedures unreasonable"). Defendant's failure to catch the inaccurate notation that was imported into plaintiffs' Visa account and the human error that resulted in the incomplete correction of its records on January 8, 2003 do not show that its procedures were unreasonable.

Plaintiffs take another tack in their effort to show the unreasonableness of defendant's procedures, arguing that its procedures for communicating with its furnishers and for making corrections were too difficult. They assert that the instructions were too vague and complex for the furnishers to follow and that these inadequate instructions led to the operator's failure to make the complete change necessary to delete the notation of deceased, as well as to Cross Country Bank's failure to advise defendant that plaintiffs were not deceased. This is a slight variation of the argument plaintiffs raised in their effort to show that defendant had violated its responsibility § 1681i(a)(2)(A) to provide its furnisher a prompt notice of a dispute. As with that challenge, plaintiffs have no evidence to support their argument. They can only point to the mistakes that were made in this case as indicative of poor procedures. At the risk of redundancy, I will repeat that the Act does not require either perfect procedures or prescience.

5. *Section 1681i(a)(5)(C)—reinserting false information into credit reports*

Section 1681i(a)(5)(C) requires consumer reporting agencies to employ reasonable procedures designed to prevent the reappearance in a consumer's file of any inaccurate or unverifiable information that has been deleted unless the deleted information has been certified as accurate by the furnisher and the agency has given notice to the consumer. Plaintiffs contend that defendant violated this statute by reinserting the notation of deceased into their Cross Country Bank Visa account after it was converted from a MasterCard account. This is slightly different from their argument that defendant did not delete the inaccurate information when it should have. Plaintiffs are arguing that defendant committed a separate violation of the Act.

The reinsertion was the result of the same mistake that Cross Country Bank (or its data processor) made originally: setting a flag improperly and not realizing that it had been set. When the new (or converted) credit card account entered defendant's system, it showed plaintiffs as deceased because of the erroneous flag. Defendant's system picked it up because it did not recognize the converted account as being the same one that had been corrected two years earlier. This continuation of the singular mistake made by the bank two years earlier does not show that defendant did not "maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to" § 1681i(a)(5)(C).

It is likely that the new notation of deceased comes within the exception in § 1681i(a)(5)(B), which allows the reinsertion of previously deleted information if the furnisher certifies that the information is complete and accurate. It is undisputed that in November 2002, Cross Country Bank verified as accurate the information that plaintiffs were deceased when defendant reinvestigated the matter in response to plaintiff Penny Anderson's letter.

Alternatively, defendant argues that a new account with its own notation of deceased cannot constitute a "reinsertion" because it is a new item of information. Plaintiffs take issue with this argument on its merits and also because they say that defendant did not raise it until its reply brief filed in connection with the March 8, 2005 order. It is not necessary to discuss the issue because plaintiffs have not shown that the absence of reasonable procedures led to the reappearance of the deceased notation in plaintiffs' new Visa account, if it was a "reappearance," or that the so-called reinsertion is not exempt under § 1681i(a)(5)(B).

6. *Section 1681i(a)(6)—failing to provide notice of result of reinvestigation*

Plaintiffs contend that defendant violated § 1681i(a)(6) by failing to provide them notice of the results of the Automated Credit Dispute Verification form it sent to Cross Country Bank on January 17, 2003. Plaintiffs do not cite any provision of the Act that requires a consumer reporting agency to notify consumers of specific responses to such a form instead of notifying them of the results of the reinvestigation. Defendant made the change that plaintiffs sought while on the telephone with plaintiff Russell Anderson; no further investigation or notice was necessary. Plaintiffs do not allege that defendant did not give them notice of the results of its two earlier reinvestigations.

B. *Section 1681e(b)*

Section 1681e deals with compliance procedures. In subsection (b) of § 1681e, it requires consumer reporting agencies to

"follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." Arguing that defendant violated this statute, plaintiffs rely heavily on their arguments that defendant violated § 1681i in all the ways itemized above. They maintain that a reasonable jury could conclude from the evidence that defendant violated this section of the statutes when it prepared consumer reports containing the notations of deceased after it had been put on notice that the notation was inaccurate. In plaintiffs' view, once they have shown that defendant prepared an inaccurate report, the burden shifts to the defendant to show that its procedures were reasonable.

█ If plaintiffs are correct about the burden-shifting, defendant has made the necessary showing. It is evident that the mistakes that haunted the parties were anomalies and were not the kind of mistakes that a furnisher would make regularly or even frequently. It would be unreasonable to require a consumer reporting agency to develop systems that would catch infrequent and irregular mistakes that furnishers might make. The Act does not impose such requirements. Its goal is to have consumer reports that are fair and accurate; it does not demand perfection from an industry that deals in billions of pieces of information.

Although courts should not countenance sloppy performance from consumer reporting agencies or tolerate inadequate procedures, they cannot hold consumer reporting agencies responsible for every problem a system can develop, including those that are novel and unanticipated. Doing so would be a misreading of the statutory obligations imposed by the Act.

Defendant has procedures in place to check the accuracy of the information their furnishers send it; it conducts training sessions for its furnishers when they become subscribers; it audits the furnishers routinely; and it has triggers to warn of unusual numbers of complaints or a higher than expected number of "conditions" showing up on the furnishers' reports, as bankruptcy proceedings, Despite these procedures, Cross Country Bank's error made its way into defendant's system and defied both the bank's and defendant's efforts to eliminate it. That it did so was unfortunate for plaintiffs, who had to deal with the error on their credit report, but in and of itself, it is not evidence that defendant's procedures were unreasonable. In the absence of any other evidence tending to show that defendant's procedures were unreasonable or that defendant did not conduct a proper reinvestigation when it should have, defendant is entitled to summary judgment in its favor.

### C. *Willfulness*

It is not necessary to consider plaintiffs' claim that defendant violated the Act wilfully now that I have found that defendant did not violate the Act negligently in any respect.

### ORDER

IT IS ORDERED that defendant Trans Union's supplemental motion for summary judgment is GRANTED. The clerk of court is directed to enter judgment for defendants Trans Union, LLC; Experian Information Solutions, Inc.; CSC Credit Services, Inc.; and Equifax, Inc., d/b/a Equifax Information Services, LLC. and close this case.