Kenneth M. MORRIS, Plaintiff,

v.

TRANS UNION LLC, Defendant.

No. Civ.A. H–04–0577.

United States District Court,
S.D. Texas, Houston Division.

Feb. 23, 2006.

Kenneth M. Morris, Attorney at Law, Houston, TX, pro se.

A. Martin Wickliff, Jr., Charles Howard Wilson, Epstein Becker et al, Houston, TX, for Intervenor Plaintiff.

Amanda Lynn Lewis, Strasburger and Price LLP, Dallas, TX, Paul Lee Myers, Strasburger & Price, Frisco, TX, Jeffrey Wayne Moles, Baker Botts, Dallas, TX, for Defendant.

## ORDER ADOPTING MAGISTRATE JUDGE'S MEMORANDUM AND RECOMMENDATION

ROSENTHAL, District Judge.

In July 2005, Magistrate Judge Johnson issued a detailed and thorough Memorandum and Recommendation, (Docket Entry No. 56), in this Fair Credit Reporting Act Case. This case was referred to Judge Johnson with two other similar cases filed by plaintiff Kenneth M. Morris. In each of the cases, Morris alleged that consumer reporting agencies failed to comply with their statutory obligation to reinvestigate disputed items on his credit reports. Morris also asserted a cause of action for libel.

Judge Johnson recommended granting defendant Trans Union LLC's motion for summary judgment; denying Trans Union's motion to strike Morris's summary judgment response evidence; overruling Morris's objections to Trans Union's summary judgment evidence; and denying the remaining motions as moot. Morris filed timely objections to the Magistrate Judge's Memorandum and Recommendation. (Docket Entry No. 58). Defendant Trans Union asked this court to adopt the Memorandum and Recommendation but, in the event this court did not do, objected on the ground that the Magistrate Judge did not recommend granting summary judgment on the alternative ground that the credit reporting of the account at issue was accurate as a matter of law. (Docket Entry No. 56). Trans Union also responded to Morris's objections. (Docket Entry No. 60).

After a *de novo* review of the Magistrate Judge's Memorandum and Recommendation and the objections and response, this court overrules Morris's objections and adopts the Memorandum and Recommendation. The reasons are set out below.

## I. Background

The Magistrate Judge's opinion set out the background in detail. Briefly, in 1997, Morris's then-wife applied for and opened a revolving credit account at Target—the "RNB–Target" account—as a joint account. Morris did not know of the account and did not sign the application. In 2002, over a year after Morris and his wife divorced, she charged $129.91 to the account. The statement was mailed to Mor-

ris's home address, the address shown on the application. Morris forwarded the bill to his former wife, who had moved to Louisiana. Morris received a second statement showing the bill as unpaid and handled it the same way. Morris's former wife only paid $20 on the account. When Morris received another statement, he contacted RNB–Target and told them to deal with his former wife, explaining that the charge was not his and that he did not intend to pay it. RNB–Target nonetheless continued to send the statements to Morris, who threw them away. In May 2003, RNB Target notified Morris that it had closed the account and charged off the unpaid amount of $253.10, including late fees and interest. RNB–Target stated that it had passed the information to national credit bureaus.

In July 2003, Morris received an adverse action letter on an automobile insurance quote. He downloaded a credit report that included information from three consumer reporting agencies, including Trans Union. The report listed Morris as jointly responsible for the RNB–Target account and showed the unpaid balance charged off as a bad debt.

Morris notified Trans Union in writing that the information in the credit report about the RNB–Target account was incorrect. Morris explained that the account should not have been treated as a joint account and that despite his request, Target had not provided any information showing that the account was in fact "ever a 'joint' account." Morris explained that the unpaid amount was charged by his former wife after their divorce and was never his responsibility. Morris explained that he had informed Target of this fact and asked Trans Union to correct the item and show it as disputed until then.

Trans Union sent an Automated Consumer Dispute Verification form to RNB–Target on July 30, 2003, identifying the disputed account and explaining the customer's dispute as in the category of "Consumer not liable for acct (i.e., ex-spouse, business)." Trans Union provided further explanation with the message: "ACCT NEVER JOINT." Trans Union's contract with RNB–Target required RNB–Target to provide "complete and accurate" information to Trans Union. In response to Trans Union's Automated Consumer Dispute Verification form, RNB–Target updated the date on which the information was reported, from June 2003 to August 2003. Trans Union notified Morris that RNB–Target had verified the account as joint and made no changes to the account information. Morris was provided with instructions on how to obtain information on the investigation and how to submit a consumer statement about the dispute.

Morris wrote Trans Union a letter in August 2003, asking that a statement be included on his credit report giving his explanation of the Target account status and asking for information on the investigation procedure. In response, Trans Union sent RNB–Target another inquiry with additional explanation: "Not his/hers" and asked for "complete ID." RNB–Target answered by again verifying the information as reported. Trans Union replied to Morris by explaining the investigation procedure and providing the names and addresses of creditors reporting information on plaintiff and creditors who had asked for Morris's credit report.

In subsequent correspondence, Trans Union sent Morris more information on the creditors who had provided information about him and who had received credit reports. Trans Union refused to provide copies of the Automated Consumer Dispute Verification forms it had sent RNB–Target to obtain verification of the disputed account status. In January

2004, Morris filed suit. Shortly after filing suit, Morris filed a number of credit card applications and sought automobile insurance quotes. Most of the credit card applications were denied, but only one company identified the only basis of the denial as Trans Union's report, and that company offered Morris a secured alternative source of credit. A second company denied Morris's application based on information obtained from two consumer reporting agencies in addition to Trans Union. One company granted Morris's application. The insurance quotes were provided without adverse action letters.

In January 2004, RNB–Target instructed Trans Union to remove the account from Morris's credit report. Morris reapplied for credit cards and received one from a company that had previously refused to issue it. This case was removed to federal court. After discovery, Trans Union moved for summary judgment.

The Magistrate Judge analyzed the statutory obligations and the summary judgment evidence. Trans Union had moved for summary judgment on the ground that, as a matter of law, the information in the credit report was accurate; the Magistrate Judge recommended denying his motion because Trans Union had failed to establish the accuracy of the joint responsibility status of the RNB–Target account. The Magistrate Judge accordingly analyzed Morris's allegations that Trans Union had violated statutory duties and caused Morris damages.

The Magistrate Judge recommended finding that although Trans Union failed to notify RNB–Target of Morris's dispute within the five-day statutory period, he suffered no harm from that breach because Trans Union complied with the statute by reporting the account status after reinvestigation within 30 days after receiving the notice of dispute, and that faster notice to RNB–Target would not have changed its response. The Magistrate Judge also recommended finding no willfulness because the record showed that Trans Union did not knowingly and intentionally delay notifying RNB–Target of Morris's dispute, with conscious disregard for his rights or with the intent to harm him. The Magistrate Judge recommended finding that Trans Union's procedure of using Automated Consumer Dispute Verification forms to transmit information about a customer dispute and obtain either verification or correction of the account status met the statute because the procedure provided RNB–Target with the information about the dispute necessary for reinvestigation. Finally, the Magistrate Judge recommended finding that there was no heightened duty to investigate Morris's dispute beyond contacting RNB–Target and accepting its response. The Magistrate Judge recommended finding that the summary judgment record did not provide any basis to infer that Trans Union was "alerted to the possibility that RNB–Target was unreliable." To the contrary, the record showed that Trans Union had over ten years of experience with credit inquiries to RNB–Target, during which RNB–Target had consistently provided reliable information. The Magistrate Judge recommended finding that Trans Union met its obligation to perform a reasonable investigation. As to the state-law libel claim, the Magistrate Judge recommended finding that the libel claim should be summarily dismissed because there was as a matter of law no basis to raise a fact issue as to malice or willful intent to injure when Trans Union published the credit report.

## II. Morris's Objections

Morris has asserted sixteen objections to the Memorandum and Recommendation.

Most of the objections are fully dealt with in the Magistrate Judge's Memorandum and Recommendation. Three areas merit some additional explanation: 1) damage causation; 2) reasonableness of the investigation; and 3) willfulness.

## A. Damage Causation

The Magistrate Judge recommended finding, as a matter of law, that Trans Union violated the FCRA only with regard to the requirement that it notify the creditor of a dispute within five days, but that the violation caused Morris no harm. Morris objects to the Magistrate Judge's findings to the extent that they require evidence linking a subsequent credit denial to a particular account and to the extent that they require evidence of a credit denial for proof of other elements of damage.

■ A consumer-reporting agency can be held liable for actual damages resulting from the agency's negligent failure to comply with the FCRA. *See* 15 U.S.C. § 1681*o*; *Stevenson v. TRW Inc.,* 987 F.2d 288, 292 (5th Cir.1993). The statements in the Magistrate Judge's Memorandum and Recommendation to which Morris objects do not require a rejection of the result because those statements did not play a role in the Magistrate Judge's conclusion. That is, although the Magistrate Judge outlined damage causation requirements, she did not apply them in this case.

■ Morris is correct that an inaccurate report can cause damage to a consumer in addition to the denial of credit. Each element of damage must be linked to the consumer-reporting agency's failure to comply with its FCRA obligations. With respect to Trans Union's conceded failure to comply with the five-day rule, the evidence shows no ill effects or harm to Morris as a result. Despite the initial delay, Trans Union provided Morris a timely report of its investigation. The undisputed evidence demonstrates that the information contained within Morris's credit report after his complaint was the same as it would have been had Trans Union initially given RNB–Target notice of Morris's dispute within the five-day statutory period. Morris's objections do not affect the outcome and do not lead this court to reject the Memorandum and Recommendation.

## B. The Reasonableness of the Investigation

Morris also objects to the conclusion in the Memorandum and Recommendation that no reasonable jury could find Trans Union's investigation unreasonable. In particular, Morris urges this court to consider Trans Union's failure to provide Morris with copies of the Automated Consumer Dispute Verification form that Trans Union used to notify RNB–Target of the nature and basis of Morris's dispute; Trans Union's alleged misrepresentation that it contacted creditors by telephone; Trans Union's failure to provide Morris a telephone number for RNB–Target; Trans Union's failure to comply with the five-day rule; Trans Union's failure to provide RNB–Target with additional information regarding the dispute; and Trans Union's failure to investigate beyond the information it received from RNB–Target. Morris also disagrees with the Magistrate Judge's recommended finding that Trans Union lacked any reason to question RNB–Target's reliability.

■ The Magistrate Judge found Trans Union's investigation to be reasonable as a matter of law because, with the exception of not communicating the dispute to RNB–Target within five days of receiving notification from Morris, Trans Union complied with the statutory requirements and exceeded them in several respects. In the Memorandum and Rec-

ommendation, the Magistrate Judge examined the summary judgment record and found no evidence indicating that Trans Union had a reason to question RNB–Target's reliability except for Morris's disagreement with the information provided. The FCRA imposes on consumer-reporting agencies a duty to conduct a reasonable investigation into any item a consumer disputes. 15 U.S.C. § 1681i(a)(1)(A); *see also Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986). The Fifth Circuit has recognized that an agency may have a duty to go beyond the creditor's response to a disputed item to conduct a reasonable investigation, but only under limited circumstances. *See Stevenson,* 987 F.2d at 293 (holding that, given the complexity of the consumer dispute, the consumer reporting agency acted unreasonably in relying solely on consumer dispute verification forms); *Pinner,* 805 F.2d at 1262 (holding that an agency's investigation was unreasonable where the only person contacted for verification was an individual who was known to have a poor personal relationship with the consumer). The Seventh Circuit has held that such a heightened duty is triggered only when the consumer alerts an agency to the possibility that the source may be unreliable or the agency itself knows or should know that the source is reliable, and the cost of verifying the accuracy of the source does not outweigh the possible harm to the consumer from the inaccuracy. *Henson v. CSC Credit Servs.,* 29 F.3d 280, 287 (7th Cir. 1994).

■ Morris's list of Trans Union's acts and omissions do not raise a fact issue as to the reasonableness of the investigation because they are not supported by the evidence, are irrelevant, and/or caused Morris no damage. On the issue of a heightened duty, this court agrees with Morris—and with the Magistrate Judge—

that a reporting agency may have a duty to go beyond a creditor's response. Even under the Seventh Circuit's approach, such a heightened duty arises only when the evidence demonstrates that the agency has a basis for questioning the reliability of the creditor's information. Under Fifth Circuit law, Morris's invective-laced railing against RNB–Target is not in itself sufficient to raise a fact issue as to whether Trans Union had a basis for questioning RNB–Target's reliability. The record shows that Trans Union had worked with RNB–Target for at least eleven years and had received no report that RNB–Target had provided unreliable information. The facts at issue here are very different from those at issue in *Stevenson,* 987 F.2d at 293, which involved a very complex consumer dispute, or in *Pinner,* 805 F.2d at 1262, which involved an agency that knew that the creditor's representative had an acrimonious personal relationship with the customer that could affect the accuracy of the information about the customer's credit. In this case, by contrast, the account dispute was simple; Trans Union communicated the dispute repeatedly, giving additional information each time; and RNB–Target, which had provided consistently reliable information for many years, reaffirmed the accuracy of the account information. Morris simply failed to raise a fact question as to whether Trans Union's knowledge of RNB–Target's reliability required Trans Union to conduct a different kind of investigation.

## C. Willfulness

Morris objects to the Magistrate Judge's recommended finding that the record did not disclose evidence of willfulness. Morris's objections center on Trans Union's alleged failure to develop policies or procedures regarding a creditor's reliability and the costs of verifying the creditor's information. Morris states, without citation:

Despite the fact that the courts have repeatedly told Trans Union of the factors that can trigger its duties to do more than simply parrot the information it receives from a creditor, Trans Union does not have policies or procedures in place to determine (or even evaluate) when a consumer has alerted it to the possibility that its source may be unreliable or to determine (or even evaluate) in any given situation the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer.[1]

Morris cites his expert's opinion about Trans Union's policies and procedures as evidence of its conscious disregard for the rights of consumers. Morris also contends that Trans Union misrepresented that it would provide a creditor's telephone number if available because it knew RNB–Target's telephone number and did not provide it to Morris.

The Magistrate Judge recommended finding that Trans Union's investigation of Morris's dispute with RNB–Target complied with the FCRA in every respect except with regard to the initial delay in notifying RNB–Target of the dispute. Based on the lack of summary judgment evidence that the delay was knowing or intentional or that Trans Union misrepresented or concealed information from Morris, the Magistrate Judge recommended a finding of no willfulness on the ground that Trans Union did not act with conscious disregard of Morris's rights.

█ Willfulness is an element of proof necessary both to show entitlement to punitive damages under the FCRA and to overcome statutory qualified immunity from state-law defamation claims. Punitive damages are justified under the FCRA when the defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Cousin v. Trans Union Corp.*, 246 F.3d 359, 372 (5th Cir.2001) (quoting *Pinner,* 805 F.2d at 1263); *see also Stevenson,* 987 F.2d at 293. Under Fifth Circuit law, damages for willfulness are appropriate only on evidence that the defendant engaged in "willful misrepresentations or concealments." *Cousin,* 246 F.3d at 374; *Stevenson,* 987 F.2d at 294. A consumer credit agency is immune from defamation claims unless it reported false information with malice or willful intent to injure the consumer. 15 U.S.C. § 1681h(e); *see also Cousin,* 246 F.3d at 375.

█ There is neither a factual or legal basis to impose the obligations Morris identified on Trans Union or to find their absence a basis for liability. Morris asserts that Trans Union had the obligation to develop specific formal policies and procedures to measure or evaluate creditor reliability and to perform a cost-benefit analysis comparing in a given situation the cost of verifying the accuracy of the source of the credit information against the possible harm inaccurately reported information may cause the consumer. Even under the test imposed by the Seventh Circuit (which is more demanding than the Fifth Circuit has recognized, *see Henson,* 29 F.3d at 287), the absence of formal policies and procedures to evaluate a creditor's reliability does not show that a consumer-reporting agency acted in conscious disregard for a consumer's rights in a specific case. In this case, the record contains no evidence of material misrepresentations or concealment by Trans Union. The summary judgment record shows that, as a matter of law, Trans Union did not violate its duty to perform a reasonable investigation into Morris's dispute. In the absence

---

1. Plaintiff's Objections, Docket Entry No. 58, p. 8.

of a violation of the FCRA, there can be no finding of willful failure to comply with the statute. This court overrules objections numbered 2, 3, 4, 5, 6, 7, 8, 14, 15, and 16. This court has considered the other objections and finds none meritorious; those objections are also overruled. Trans Union's conditional objections are overruled as moot.

## III. Conclusion

This court adopts the Magistrate Judge's Memorandum and Recommendation. Trans Union's motion for summary judgment is granted. Morris's motion to strike Trans Union's motion for summary judgment is denied. Trans Union's motion to strike Morris's response evidence is denied. Morris's objections to Trans Union's summary judgment evidence are overruled. The remaining outstanding motions are denied as moot. Final judgment is entered by separate order.

## *MEMORANDUM AND RECOMMENDATION*

JOHNSON, United States Magistrate Judge.

Pending before the court[1] are Defendant's Motion for Summary Judgment (Docket Entry No. 26), Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment (Docket Entry No. 33), and Defendant's Motion to Strike Plaintiff's Response Evidence (Docket Entry No. 48). Also pending are two motions to exclude expert testimony (Docket Entry Nos. 23, 25), a motion to compel (Docket Entry No. 30), and a motion to intervene (Docket Entry No. 39). The court has considered the motions, all relevant filings, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's summary judgment motion be **GRANTED**.

Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment is **DENIED**. Defendant's motion to strike Plaintiff's response evidence is **DENIED** and Plaintiff's objections to Defendant's evidence are **OVERRULED** because the court has not relied on any incompetent evidence. Pending adoption of this Memorandum and Recommendation, all remaining motions are **DENIED AS MOOT**.

### I. Case Background

Plaintiff filed this action under the Fair Credit Reporting Act ("FCRA") against Defendant, a consumer reporting agency, alleging that Defendant failed to comply with its obligations in relation to the reinvestigation of a disputed item on Plaintiff's personal credit report. Plaintiff also brought a claim for libel. This case is one of several cases originally filed by Plaintiff in state court that deal with the allegedly inaccurate reporting of some of Plaintiff's credit information.[2]

---

1. This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Docket Entry No. 22.

2. In two other cases that are pending before this court, Plaintiff sued Equifax Information Services LLC, CSC Credit Services, Inc., and Experian Information Solutions, Inc., all consumer reporting agencies, for violations of the FCRA. *See Morris v. Equifax Info. Servs. LLC,* Civil Action No. H-04-423 (S.D. Tex. re-

moved Feb. 2, 2004) (dismissed June 28, 2005); *Morris v. Experian Info. Solutions, Inc.,* Civil Action No. H-04-552 (S.D. Tex. removed Feb. 12, 2004). Plaintiff also filed suit against Target Corporation and Retailers National Bank in state court. *See Morris v. Target Corporation,* No. 801888 (Harris County Civil Court at Law No. 4 Sept. 24, 2003). According to various references in the record, Plaintiff apparently settled his claims against CSC Credit Services, Inc., Target Corporation, and Retailers National Bank.

The background facts in all of the cases are very similar. Plaintiff's complaint relates to a revolving credit account with Retailers National Bank–Target[3] ("RNB–Target").[4] The origin of the account can be traced to an Instant Credit Application submitted to RNB–Target on June 18, 1997, by Plaintiff's then-wife, Rebecca B. Morris ("Rebecca").[5] The application includes Plaintiff's name, address, date of birth, social security number, place of employment, and other identifying information.[6] Even though Rebecca identified Plaintiff as the primary applicant and herself as the "Joint Applicant," she signed the application as the applicant, not the "Joint Applicant."[7] Plaintiff did not sign the application form.[8] Plaintiff testified that he did not authorize the opening of the account and did not communicate with RNB–Target before it established the account.[9] Nearly four years after Target opened the credit account, Plaintiff and Rebecca divorced.[10] At that time, Plaintiff

affirmed, he did not know that the Target account existed.[11]

In August 2002, after the divorce, Rebecca charged $129.91 in merchandise to the account at a Target in Baton Rouge, Louisiana.[12] RNB–Target mailed the August statement, which reflected this charge, to Plaintiff's home address.[13] Plaintiff forwarded that statement to Rebecca, who lived in Louisiana.[14] Upon receiving the September statement, Plaintiff forwarded that to Rebecca as well.[15] Rebecca made payments totaling $20 on the account.[16] After Plaintiff received the September statement, he contacted RNB–Target by phone, gave Rebecca's address, and stated that he did not intend to pay the bill.[17] Nevertheless, RNB–Target continued to mail bills to Plaintiff.[18] Plaintiff threw all of the subsequent bills in the trash.[19]

In a letter dated May 23, 2003, RNB–Target notified Plaintiff that it had

3. Retailers National Bank, a subsidiary of Target Corporation, is now know as Target National Bank. Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 11, Declaration of William R. Stockdale, ¶ 12. In this Memorandum, the court refers to the creditor on the Morris Target account as RNB–Target.

4. *See* Notice of Removal, Docket Entry No. 1, Ex. C–1, Plaintiff's Original Petition.

5. Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 56, Instant Credit Application.

6. *Id.; see also* Ex. 14, Plaintiff's Deposition, p. 90.

7. *Id.* at Ex. 56, Instant Credit Application.

8. *See id.*

9. Exhibits to Plaintiff's Response, Docket Entry No. 43, Ex. 1, Plaintiff's Declaration, ¶ 29.

10. *See id.* at ¶ 28.

11. Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 14, Plaintiff's Deposition, p. 135.

12. *See id.* at Ex. 59, RNB–Target billing statement dated Aug. 19, 2002; Exhibits to Plaintiff's Response, Docket Entry No. 43, Ex. 1, Plaintiff's Declaration, ¶ 30.

13. *See* Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 59, RNB–Target billing statement dated Aug. 19, 2002.

14. *Id.* at Ex. 14, Plaintiff's Deposition, p. 125.

15. *Id.* at p. 126.

16. *See id.* at Ex. 12, Deposition of Susan Wolf, pp. 126, 317–18.

17. *Id.* at Ex. 14, Plaintiff's Deposition, p. 126.

18. *Id.* at p. 127.

19. *Id.*

charged-off the remaining debt on the account in the amount of $253.10, which apparently included late fees and interest along with the remaining balance from Rebecca's August 2002 purchase.[20] The letter also stated that RNB–Target had permanently closed the account and had reported the negative account information to national credit bureaus.[21]

In July 2003, Plaintiff received an adverse action letter concerning an automobile insurance quote from GEICO.[22] Immediately, Plaintiff downloaded an internet "3–in–1 Credit Report" prepared by True-Credit.[23] The report included information from three consumer reporting agencies, including Defendant.[24] All three consumer reporting agencies listed Plaintiff as jointly responsible for the RNB–Target account, the balance of which had been charged off as a bad debt.[25]

Within two weeks, Plaintiff dispatched to Defendant a letter in which he addressed various allegedly inaccurate items.[26] Plaintiff notified Defendant that he was no longer married to Rebecca, corrected certain identifying information, and stated the following regarding the RNB–Target account:

    a.  **RNB–Target:** I owe Target nothing. This was never a "joint" account. I have asked Target to send me any information that shows this account was ever a "joint" account that obligated me. Target has not provided me this information and cannot do so.

The balance that Target has charged off derives from a charge effected by my Former Wife in late 2001[sic] (after our divorce). The charge is not (and has never been) my legal responsibility. I have informed Target of this fact on numerous occasions, but Target's ears are deaf to reality.

In short, Target's bureaucratic bungling is solely responsible for this false information that Target has furnished to you. It is the only "derogatory" condition that you show on my credit report.

Please correct this item and show it as disputed until you correct it. I'll litigate with Target separately. Target's feckless attitude toward this issue is simply reprehensible. Target has absolutely no legitimate basis for claiming that I owe (or ever owed) this alleged debt.[27]

Plaintiff also challenged information associated with two other accounts on the credit report.[28] On that same day, Plaintiff drafted similar letters addressed to RNB, Equifax Information Services, and Experian Information Solutions.[29] Defendant received Plaintiff's letter on July 19, 2003.[30]

---

**20.** *See id.* at Ex. 12, Deposition of Susan Wolf, p. 161; Ex. 37, letter from RNB–Target to Plaintiff dated May 23, 2003.

**21.** *Id.* at Ex. 37, letter from RNB–Target to Plaintiff dated May 23, 2003.

**22.** *Id.* at Ex. 14, Plaintiff's Deposition, p. 48.

**23.** *Id.* at pp. 48–49; Ex. 15, TrueCredit report dated July 3, 2003.

**24.** *See id.* at Ex. 15, TrueCredit report dated July 3, 2003.

**25.** *See id.* at MOR 000015.

**26.** *Id.* at Ex. 14, Plaintiff's Deposition, pp. 49–50; Ex. 16, letter from Plaintiff to Defendant dated July 16, 2003.

**27.** *Id.* at Ex. 16, letter from Plaintiff to Defendant dated July 16, 2003, p. 3.

**28.** *See id.*

**29.** *See id.* at Ex. 14, Plaintiff's Deposition, p. 50.

**30.** *See* Appendix in Support of Defendant's Motion for Summary Judgment, Vol. I, Docket Entry No. 27, Ex. 1, Plaintiff's First Amended Complaint, p. 4.

The relationship between Defendant and RNB–Target as to the reporting of consumer accounts was governed by a contract.[31] Pursuant to the agreement, RNB–Target committed to furnish "complete and accurate" information to Defendant and to comply "with all requirements of the FCRA."[32] Furthermore, RNB–Target agreed to certify as complete and accurate the information it provided in response to Defendant's notifications of consumer disputes.[33] According to Defendant, RNB–Target was a reliable furnisher of information for many years.[34] No one, for at least a decade prior to Plaintiff's dispute, had reported problems with RNB–Target's reporting of account information.[35]

In accordance with its agreement with RNB–Target and its usual practice, Defendant sent an Automated Consumer Dispute Verification ("ACDV")[36] form to RNB–Target, identifying the dispute as "Consumer not liable for acct (i.e., ex-spouse, business). If liable, provide complete ID and [Equal Credit Opportunity Act ('ECOA')] Code."[37] The form also included the following information in the "consumer message" section: "CLMS ACCT IS IN DISPUTE AND ACCT NEVER JOINT."[38] On the form, Defen-dant included Plaintiff's name, address, and other identifying information, as well as details about the account in question.[39] Defendant sent the form to RNB–Target on July 30, 2003.[40]

In its August 8, 2003, response to the ACDV, RNB–Target updated the date on which the information was reported from June 2003 to August 2003.[41] On August 12, 2003, Defendant sent Plaintiff the results of the investigation in the form of a consumer report.[42] The report reflected that the RNB–Target verified the account as joint and made no changes to the account information.[43] Defendant explained that Plaintiff could request information about how the investigation was conducted and the name, address, and telephone number of persons contacted, as well as submit a consumer statement concerning the RNB–Target dispute inclusion on his report.[44]

The report prompted Plaintiff to write Defendant another letter, dated August 19, 2003.[45] In his second letter, Plaintiff requested that the following statement be added to his report:

> RNB–Target has provided false and legally erroneous information about me to

---

31. *See* Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 11, Declaration of William R. Stockdale, ¶ 12.

32. *Id.*

33. *Id.*

34. *Id.* at ¶ 13.

35. *Id.*

36. Consumer Dispute Verification forms are referred to as CDV forms in this memorandum.

37. Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 57, RNB–Target Aug. 9, 2003, response to ACDV form dated July 30, 2003.

38. *Id.*

39. *Id.*

40. *See id.*

41. *Id.*

42. *See id.* at Ex. 17, Consumer Report dated August 12, 2003.

43. *Id.* at MOR 000379.

44. *Id.* at MOR 000379, MOR 000384.

45. *Id.* at Ex. 21, letter from Plaintiff to Defendant dated Aug. 19, 2003.

TransUnion. I have never opened, maintained, or assumed legal responsibility for any account at Target. I have never charged a Target purchase to a Target account in my lifetime. I have informed Target of these facts and requested information from Target concerning this alleged account that it has not provided to me and cannot provide to me (because it does not exist). I have legal demands pending against Target concerning this matter. I have never owed Target a penny (or more). Target's conduct here is shameful.[46]

Plaintiff also requested several pieces of information from Defendant, including a description of the procedure used to investigate, a description of the procedure used to determine the accuracy and completeness of the RNB–Target's response, correspondence between Defendant and RNB–Target from January 1, 2003, and the name, business address, and telephone number of those persons contacted in the process.[47]

Defendant responded to this letter by initiating another reinvestigation and by writing Plaintiff two letters.[48] In the second ACDV, Defendant identified the dispute as "Not his/hers. Provide complete ID." [49] RNB–Target verified the information as reported.[50] The two letters, both

dated August 29, 2003, were mailed before Defendant received RNB–Target's response.[51] One letter denied Plaintiff's request for copies of all correspondence between Defendant and RNB–Target by explaining its policy not to provide ACDV forms to consumers.[52] The letter also explained Defendant's investigation procedure, stating in particular that Defendant's practice was "to contact, by mail or telephone, the source of the [disputed] information." [53] The other letter contained the names and addresses of all creditors that reported information on Plaintiff, including RNB–Target, and the names and addresses of all creditors who had received copies of Plaintiff's credit report.[54]

Still dissatisfied with Defendant's response, Plaintiff wrote Defendant a third letter, dated September 5, 2003.[55] Therein, Plaintiff posed a number of questions challenging Defendant's response to his second letter.[56] For example, Plaintiff wrote:

3. In connection with your alleged investigation of my inquiries, did you receive any "dispute verification responses from creditors" that you are refusing to provide me? If so, please provide me the name and address of each particular creditor who pro-

---

**46.** *Id.* at p. 2.

**47.** *Id.* at p. 1.

**48.** *See id.* at Ex. 13, RNB–Target Sept. 12, 2005, response to ACDV form dated August 30, 2003; Ex. 18, letter from Defendant to Plaintiff dated Aug. 29, 2003; Ex. 20, letter from Defendant to Plaintiff dated Aug. 29, 2003.

**49.** *See id.* at Ex. 13, RNB–Target Sept. 12, 2005, response to ACDV form dated August 30, 2003.

**50.** *Id.*

**51.** *See id.* at Ex. 18, letter from Defendant to Plaintiff dated Aug. 29, 2003; Ex. 20, letter

from Defendant to Plaintiff dated Aug. 29, 2003.

**52.** *Id.* at Ex. 18, letter from Defendant to Plaintiff dated Aug. 29, 2003.

**53.** *Id.*

**54.** *Id.* at Ex. 20, letter from Defendant to Plaintiff dated Aug. 29, 2003.

**55.** *Id.* at Ex. 22, letter from Plaintiff to Defendant dated Sept. 5, 2003.

**56.** *Id.*

vide[d] you a "dispute verification" response that you are refusing to provide me. The law does not entitle you to withhold from me any dispute verification that you receive from any creditor concerning your alleged investigation of my credit file.

4. Why have you *not* provided me "the name, address, and telephone number of anyone whom you contacted for information" in connection with your alleged investigation of [my] credit file? You have provided me a list of creditors, but you have not identified *any* particular creditors or named *any* particular person at any creditor that you contacted in connection with your alleged investigation. Simply put, you failed to comply with your legal obligations under federal and Texas law to provide me the information that I specifically requested.[57]

Plaintiff concluded the letter by stating: "I expect you to comply fully with your legal obligations. Boilerplate responses (generalized in nature) only exacerbate the situation. Let's get to the bottom of this now."[58]

Upon receiving Plaintiff's third letter, Defendant sent two more letters to Plaintiff, both dated September 16, 2003.[59] One explained Defendant's investigation procedures again, this time, indicating that De-

fendant contacted the source of the information by "mail or electronic means."[60] The letter included an address for "RNB–Dayton/Hudson/Fields," but no phone number.[61] The other letter informed Plaintiff that he should contact the creditor directly for any documentation or written verification concerning his account.[62] On the same date as the letters, Defendant sent Plaintiff the results of its second investigation.[63] The report reflected that RNB–Target verified the account and included the consumer statement that Plaintiff previously submitted.[64]

The correspondence between Plaintiff and Defendant continued with Plaintiff's next letter, dated September 22, 2003.[65] Plaintiff charged Defendant with the failure to provide the information that he requested or to answer several of the questions he posed.[66] He also threatened legal action:

You apparently have provided me all information you intend to provide me. I again request that you confirm in writing that you do not intend to provide me any additional information, as I want to eliminate any doubt before I commence legal action against you. Your redundant and additional boilerplate form letters are grossly inadequate. You continue to refuse to honor your legal obligations.[67]

---

57. *Id.* at pp. 1–2.

58. *Id.* at p. 2.

59. *See id.* at Ex. 19, letter from Defendant to Plaintiff dated Sept. 16, 2003; Ex. 23, letter from Defendant to Plaintiff dated Sept. 16, 2003.

60. *Id.* at Ex. 19, letter from Defendant to Plaintiff dated Sept. 16, 2003.

61. *Id.*

62. *Id.* at Ex. 23, letter from Defendant to Plaintiff dated Sept. 16, 2003.

63. *See id.* at Ex. 24, consumer report dated Sept. 16, 2003.

64. *Id.* at pp. 1, 5–6.

65. *See id.* at Ex. 60, letter from Plaintiff to Defendant dated Sept. 22, 2003.

66. *Id.* at p. 1.

67. *Id.* at p. 2.

Defendant responded on October 1, 2003, by sending Plaintiff another copy of his consumer report and three letters.[68] This time, the letters included the full list of creditors from which information had been received and to which reports had been provided, reiterated its policy on the provision of ACDV forms, avowed an inability to determine the nature of Plaintiff's request, requested more information from Plaintiff, and requested that Plaintiff contact Defendant directly by phone.[69] Then, the parties engaged in a brief stint of futile telephone tag in October 2003.[70]

The record lacks evidence of any further communication between Plaintiff and Defendant prior to the inception of this lawsuit in January 2004. Shortly after filing suit, Plaintiff began applying for credit.[71] In January, Plaintiff applied for credit cards from Bank of America, Capital One, Chase, Discover, and Citibank.[72] All but Bank of America denied him the credit he sought.[73] Of the companies rendering a negative decision, only Capital One and Chase identified Defendant as one of the consumer reporting agencies from which they received information.[74] Capital One denied Plaintiff credit "based in whole or in part on information" obtained from Defendant and two other consumer reporting agencies.[75] The letter did not link the denial to the RNB–Target account.[76] Chase denied Plaintiff unsecured credit, but offered him a line of credit secured by funds deposited into a Chase money-market savings account.[77] The letter from Chase also did not link the denial specifically to the RNB–Target account.[78] Chase listed Defendant as the only consumer reporting agency on whose report Chase based its denial.[79]

Plaintiff also sought automobile insurance quotes from GEICO and Progressive, both of which provided quotes without ad-

**68.** *See id.* at Ex. 26, letter from Defendant to Plaintiff dated Oct. 1, 2003; Ex. 28, consumer report dated Oct. 1, 2003; Ex. 29, letter from Defendant to Plaintiff dated Oct. 1, 2003; Ex. 30, letter from Defendant to Plaintiff dated Oct. 1, 2003.

**69.** *Id.* at Ex. 26, letter from Defendant to Plaintiff dated Oct. 1, 2003; Ex. 29, letter from Defendant to Plaintiff dated Oct. 1, 2003; Ex. 30, letter from Defendant to Plaintiff dated Oct. 1, 2003.

**70.** *Id.* at Ex. 14, Plaintiff's Deposition, pp. 181–85.

**71.** *Id.* at pp. 219–20.

**72.** *See id.* at Ex. 43, Bank of America online application pending notification; Ex. 46, Chase application receipt; Ex. 47, Citibank application receipt; Ex. 51, Discover application receipt. Plaintiff also intended to apply for a credit card from Amazon.com, but chose not to submit an application because he could not affirm that his credit was clear of "seriously delinquent accounts." *See id.* at Ex. 14, Plaintiff's Deposition, pp. 233–34; Ex. 42, blank online Amazon.com application.

**73.** *Id.* at Ex. 32, letter from Capital One to Plaintiff dated Jan. 14, 2004; Ex. 35, letter from Chase to Plaintiff dated Jan. 17, 2004; Ex. 43, Bank of America online application approval; Ex. 48, letter from Citibank to Plaintiff dated Jan. 16, 2004; Ex. 52, letter from Discover to Plaintiff dated Jan. 15, 2004.

**74.** *See id.* at Ex. 32, letter from Capital One to Plaintiff dated Jan. 14, 2004; Ex. 35, letter from Chase to Plaintiff dated Jan. 17, 2004; Ex. 48, letter from Citibank to Plaintiff dated Jan. 16, 2004; Ex. 52, letter from Discover to Plaintiff dated Jan. 15, 2004.

**75.** *Id.* at Ex. 32, letter from Capital One to Plaintiff dated Jan. 14, 2004.

**76.** *See id.*

**77.** *Id.* at Ex. 35, letter from Chase to Plaintiff dated Jan. 17, 2004.

**78.** *Id.*

**79.** *Id.*

verse action letters.[80] In February, Plaintiff applied for a United credit card, which was granted.[81]

Although the dispute between Plaintiff and Defendant was not resolved to Plaintiff's satisfaction, ultimately, RNB–Target instructed Defendant to remove the account from Plaintiff's credit report.[82] Defendant made the change on January 19, 2004.[83] After Defendant removed the RNB–Target account, Plaintiff decided to reapply for the credit cards that he had been denied him.[84] Plaintiff was ineligible to reapply for the Capital One credit card because fewer than forty-five days had passed since his prior application.[85] Chase, however, allowed his application and issued him the credit card he sought.[86]

At about the same time, Defendant timely removed this action. Plaintiff did not contest the removal. A little over a year later, Defendant filed the pending motion for summary judgment. The court now addresses the issues raised by Defendant in that motion.

## II. Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Brown v. City of Houston*, 337 F.3d 539, 540–41 (5th Cir.2003). The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.1992).

If the moving party can show an absence of record evidence in support of one or more elements of the case for which the nonmoving party bears the burden, the movant will be entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. In response to a showing of lack of evidence, the party opposing summary judgment must go beyond the pleadings and proffer evidence which establishes each of the challenged elements of

**80.** *See id.* at Ex. 40, GEICO quote; Ex. 41, Progressive quote.

**81.** *See id.* at Ex. 54, undated letter from United to Plaintiff.

**82.** *See* Appendix in Support of Defendant's Motion for Summary Judgment, Vol. I, Docket Entry No. 27, Ex. 9, Declaration of Lynn Romanowski, ¶ 4.

**83.** *Id.*

**84.** *See* Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 14, Plaintiff's Deposition, p. 237. In his deposition, Plaintiff stated:

> I wanted to see after I knew that Target was taken off, if I could go back to those same people and get credit cards that had denied them, because I thought that would be really good evidence that the credit reporting agencies would [have] difficulty arguing with that it was the Target account that caused me the denial of credit, in fact, in reality.

> *Id.*

**85.** *See id.* at pp. 237–38 (stating that he did not reapply after discovering that he was not eligible); Ex. 33, blank internet Capital One application.

**86.** *See* Ex. 14, Plaintiff's Deposition, pp. 239–40; Ex. 36, undated letter from Chase to Plaintiff. The RNB–Target account was not the only account with derogatory information that had been deleted from his credit report. *See* Appendix in Support of Defendant's Motion for Summary Judgment, Vol. I, Docket Entry No. 27, Ex. 9, Declaration of Lynn Romanowski, ¶¶ 6–7.

the case, demonstrating that genuine issues of material fact do exist which must be resolved at trial. *Id.* at 324, 106 S.Ct. 2548. A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. *Id.* at 250, 106 S.Ct. 2505.

The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Meinecke v. H & R Block of Houston,* 66 F.3d 77, 81 (5th Cir.1995). Conclusory allegations, unsubstantiated assertions, improbable inferences, unsupported speculation, or only a scintilla of evidence will not carry this burden. *Brown,* 337 F.3d at 541; *Ramsey v. Henderson,* 286 F.3d 264, 269 (5th Cir. 2002). When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party." *Evans v. City of Houston,* 246 F.3d 344, 348 (5th Cir.2001). The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *See Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir.1987).

The court must grant summary judgment if, after an adequate period of discovery, the nonmovant fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548. In the absence of summary judgment evidence that an actual controversy exists, the court cannot assume that the nonmoving party can or will prove the necessary facts at

trial. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

### III. Analysis

Plaintiff brought claims against Defendant under the FCRA for violations of its statutory reinvestigation obligations and under state law for libel. The court addresses these separately.

### A. *FCRA Claims*

Congress designed the FCRA to meet "the needs of commerce for consumer credit, personnel, insurance, and other information" while also ensuring "the confidentiality, accuracy, relevancy, and proper utilization" of consumer information. 15 U.S.C. § 1681(b); *Stevenson v. TRW Inc.,* 987 F.2d 288, 292 (5th Cir.1993). The FCRA "defines a complex set of rights and obligations that attend the relationships among and between the provider of a credit report, the user of that information and the consumer who is made the subject of such a report." *Sepulvado v. CSC Credit Servs., Inc.,* 158 F.3d 890, 895 (5th Cir. 1998). The FCRA requires that consumer reporting agencies "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b); *see also Pinner v. Schmidt,* 805 F.2d 1258, 1261–62 (5th Cir. 1986). The statute also imposes on the consumer reporting agencies a duty to conduct a reasonable reinvestigation into any item that is disputed by a consumer. 15 U.S.C. § 1681i(a)(1)(A); *Pinner,* 805 F.2d at 1262.

With regard to this latter duty, the agency is allowed thirty days (unless extended in accordance with the statute) to conduct its reinvestigation. 15 U.S.C. § 1681i(a)(1). As part of the reinvestigation, the agency shall review and consider all relevant information in the consumer file and all relevant information submitted

by the consumer regarding the dispute. 15 U.S.C. § 1681i(a)(4). Additionally, the agency must notify the creditor within five business days after receiving the consumer's notice of dispute. 15 U.S.C. § 1681i(a)(2)(A). "The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller." *Id.*

If an item is found to be inaccurate or incomplete, the agency promptly shall delete that item or modify it and shall notify the creditor that the item was deleted or modified. 15 U.S.C. § 1681i(a)(5)(A). Regardless of the outcome of the reinvestigation, the consumer reporting agency must provide written notice of the results to the consumer. 15 U.S.C. § 1681i(a)(6)(A). The consumer notice shall include, "if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information ..., including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available." 15 U.S.C. § 1681i(a)(6)(B)(iii). Finally, if the reinvestigation does not resolve the dispute, the consumer may file a statement explaining the nature of the dispute to be printed alongside the disputed item on the credit report. 15 U.S.C. § 1681i(b).

■ If a consumer reporting agency willfully fails to comply with these requirements, it may be liable for punitive damages in addition to actual damages. 15 U.S.C. § 1681n; *Stevenson,* 987 F.2d at 292; *Pinner,* 805 F.2d at 1262. However, the FCRA does not impose strict liability on consumer reporting agencies for negligent noncompliance. *See* 15 U.S.C. § 1681*o*; *See Hyde v. Hibernia Nat'l Bank in Jefferson Parish,* 861 F.2d 446, 447 (5th Cir.1988); *Thompson v. San Antonio Retail Merchs. Ass'n,* 682 F.2d 509, 513 (5th Cir.1982). A consumer reporting agency that unintentionally errs can be held liable only for the consumer's actual damages that resulted from the agency's failure to comply with the statute. *See* 15 U.S.C. § 1681*o*; *Stevenson,* 987 F.2d at 292; *Pinner,* 805 F.2d at 1262; *Hyde,* 861 F.2d at 448. To succeed on his FCRA claims, Plaintiff bears the ultimate burden of proving that a credit report issued by Defendant was a causal factor in the denial of credit. *See Crabill v. Trans Union, L.L.C.,* 259 F.3d 662, 664 (7th Cir.2001); *Philbin v. Trans Union Corp.,* 101 F.3d 957, 969 (3rd Cir.1996); *Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1161 (11th Cir.1991).

In this lawsuit, Plaintiff alleged that Defendant failed to follow the reinvestigation provisions in that: 1) Defendant did not provide any information to RNB–Target within five days of receiving Plaintiff's dispute; 2) Defendant failed to provide RNB–Target with all of the relevant information regarding the dispute; and 3) Defendant failed to meet its duty to go beyond RNB–Target's response in verifying the accuracy of the reported information. Defendant moves for summary judgment on the basis that Plaintiff's file contained accurate information. Alternatively, Defendant counters Plaintiff's challenges to the reasonableness of its reinvestigation.[87] Finally,

---

87. Defendant also addresses other complaints that Plaintiff raised during the course of their dispute, including Plaintiff's allegations that Defendant violated section 1681i by failing to provide Plaintiff with copies of the ACDVs when requested, falsely stating, in a letter to Plaintiff, that it contacted creditors by telephone, and failing to provide a telephone number for RNB–Target. *See* Defendant's Motion for Summary Judgment, Docket Entry No. 26, pp. 28–30. Plaintiff does not pursue these allegations in his response to Defendant's summary judgment motion. Despite the lack of response, the court has considered

Defendant argues that Plaintiff suffered no damages. The court turns first to the accuracy question before reaching the other issues.

### 1. Accuracy

■ The statute imposes a consumer reporting agency the duty to investigate any item disputed by a consumer, regardless of the ultimate determination on accuracy.[88] *See* 15 U.S.C. § 1681i(a)(1)(A). At the same time, case law and common sense dictate that a consumer may bring a claim under the FCRA for negligent noncompliance only when an inaccuracy has been included on his credit report. *Cf. Cahlin,* 936 F.2d at 1160 ("[A] section [1681i(a)] claim is properly raised when a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry."). Absent an inaccuracy in a credit report that was published to a third party, no damages proximately caused by an FCRA violation would result. *See Hyde,* 861 F.2d at 448.

Plaintiff contends that the information on the RNB–Target account was inaccurate in that it stated that he was jointly responsible for the debt. Defendant argues that it was entitled, even obligated, under the ECOA to label the account as joint because RNB–Target reported the account with a joint responsibility ECOA designation. Because the reporting of the account as joint was authorized by federal law, Defendant insists, it was accurate. Defendant's argument is unconvincing. Despite Defendant's profuse citation to the ECOA, it cites no provision that establishes that Plaintiff was jointly responsible for the account.

The ECOA protects consumers against credit discrimination based on race, color, religion, national origin, sex, marital status, age, or status as recipients of public assistance. 15 U.S.C. § 1691(a). The statute is designed to allow equal access to credit for all creditworthy customers and to set rules concerning what information can and cannot be considered by creditors. *See id.*

Defendant attempts to convert the provisions of the ECOA into something they are not. For example, relying on the ECOA's implementing regulations, Defendant argues that Plaintiff's signature was not required on the application in order for

---

the viability of these claims and finds that they all fail for lack of evidence that they caused Plaintiff any damage. Moreover, the first two complaints do not allege any action in violation of the statute and the third complaint is not supported by the facts.

**88.** Defendant argues that evidence of the inaccuracy of the reported information is required to establish a section 1681i prima facie case. Case law is not so clear that the accuracy of the information would absolve a consumer reporting agency from its reinvestigation requirements. No Fifth Circuit opinion specifically identifies the prima facie elements of a section 1681i claim. However, two opinions out of the northern district of Texas omit accuracy from the list of elements, stating that a section 1681i(a) claim requires proof that: 1) the consumer "disputed the completeness or accuracy of an item of information contained in her consumer file;" 2) the consumer reporting agency "did not reinvestigate free of charge and either record the current status of the disputed information or delete the item from the file ... within the statutory period;" 3) the consumer reporting agency's noncompliance was negligent; 4) the consumer suffered an injury; and 5) the injury was caused by the consumer reporting agency's "failure to reinvestigate and record the current status of the disputed information or delete the item from the file." *Waggoner v. Trans Union, LLC,* No. Civ. A. 302CV1494G, 2003 WL 22220668, at *9 (N.D.Tex. July 17, 2003); *Zala v. Trans Union, LLC,* No. CIV. A. 3:99–CV–0399, 2001 WL 210693, at *5 (N.D.Tex. Jan.17, 2001).

RNB–Target to designate the account as a joint account. However, the regulations upon which Defendant relies say no such thing. The regulations only explain when a spouse's signature may be required on a credit instrument for qualification purposes. *See* 12 C.F.R. § 202.7(d)(3). They say nothing about whether a spouse is obligated on an account without a signature. *See id.* Supplement I to part 202 of section 12 of the Code of Federal Regulations explains section 202.7(d)(3) with regard to joint applications:

> The term "joint applicant" refers to someone who applies contemporaneously with the applicant for shared or joint credit. It does not refer to someone whose signature is required by the creditor as a condition for granting the credit requested.
>
> ... A person's intent to be a joint applicant must be evidenced at the time of application.... [S]ignatures or initials on a credit application affirming applicants' intent to apply for joint credit may be used to establish intent to apply for joint credit.

The regulations require a creditor to designate accounts "to reflect the participation of both spouses *if* the applicant's spouse is permitted to use or is contractually liable on the account." 12 C.F.R. § 202.10 (emphasis added). This section does not authorize creditors to designate accounts held individually by one spouse as joint accounts; nor does it place an imprimatur of accuracy on designations made by creditors. The ECOA simply does not authorize a creditor to report a person as a joint account-holder without some indication that person intended to be jointly responsible for that debt.

█ Defendant failed to produce any evidence of Plaintiff's intent to be a joint applicant at the time of application. The application itself does not contain Plaintiff's signature or indicate in any other way that he intended to apply for a joint account with Rebecca. Plaintiff's only contemporaneous connection to the account was by virtue of his status as Rebecca's husband. Defendant cites the court to no legal authority holding that a husband is jointly liable on all credit card accounts established by his wife. The ECOA regulations specifically allow creditworthy persons to open individual accounts regardless of marital status and acknowledge the difference between individual and joint accounts. *See* 12 C.F.R. § 202.7(a) and (d)(1). Short on legal or evidentiary support, Defendant fails to establish the accuracy of the joint responsibility status as a matter of law and the question remains whether the information in the credit report was accurate. Thus, the court must consider each of the alleged violations of the statute.

### 2. Five-day Notice Requirement

As to Plaintiff's allegation that Defendant failed to provide timely notice to RNB–Target of the dispute, Defendant does not contest the evidence establishing that it did not notify RNB–Target within the five-day statutory period. Rather, Defendant argues that it did not owe a duty to Plaintiff, as a consumer, to transmit the dispute within the statutory time period and that Plaintiff suffered no harm as a result of the delay. The court disagrees with Defendant on the first point, but agrees on the second.

Although interesting and mildly appealing, Defendant's argument that the five-day notice requirement is a duty owed the creditor, not Plaintiff, reads too much into the statute. Section 1681i imposes requirements without specifying to whom each duty is owed. *See* 15 U.S.C. § 1681i(a)(2)(A). Consumer reporting agencies are liable for damages suffered

by a consumer as a result of the agency's failure to comply with *any* requirement. *See* 15 U.S.C. §§ 1681n, 1681o. As suggested by the damages provisions, every duty in the statute ultimately is owed to the consumer.

On the other hand, a consumer is entitled only to those damages caused by the particular act of noncompliance. In this case, Plaintiff suffered no harm from Defendant's failure to comply with the five-day notice requirement. Despite its initial delay, Defendant managed to comply with section 1681i(a)(1)(A) by recording the status of the account after reinvestigation before thirty days elapsed after Defendant received Plaintiff's notice of dispute.[89] Moreover, the uncontroverted evidence indicates that a more prompt notice to RNB–Target would not have changed its response.[90]

The statute seems to indicate that, even absent evidence that Defendant's noncompliance caused actual damages, Defendant could be liable for punitive damages upon a showing of willfulness. *See* 15 U.S.C. § 1681n(a)(2) (separating the entitlement to punitive damages from the causation requirement). However, in order to support a finding of willfulness to justify punitive damages, Plaintiff must produce evidence that Defendant "knowingly and intentionally committed an act in conscious disregard for the rights of others." *Cousin v. Trans Union Corp.*, 246 F.3d 359, 372 (5th Cir.2001) (quoting *Pinner*, 805 F.2d at 1263); *see also Stevenson*, 987 F.2d at 293. Two Fifth Circuit opinions held that damages for willfulness are appropriate only on evidence that the defendant engaged in "willful misrepresentations or concealments." *Cousin*, 246 F.3d at 374; *Stevenson*, 987 F.2d at 294.

No summary judgment evidence supports the conclusion that Defendant knowingly and intentionally delayed notifying RNB–Target of Plaintiff's dispute in conscious disregard for Plaintiff's rights or that Defendant set out to harm Plaintiff.[91] The summary judgment record includes no evidence of misrepresentation or concealment. *Cf. Cousin*, 246 F.3d at 372, 374 (finding insufficient evidence of willfulness); *Pinner*, 805 F.2d at 1263 (same); *Stevenson*, 987 F.2d at 294 (same). Defendant's actions do not rise to the level of willfulness.

### 3. All Relevant Information Requirement

■ In response to Plaintiff's allegation that Defendant failed to provide RNB–Target with "all relevant information regarding the dispute that the agency has received from the consumer," Defendant argues that it complied with section 1681i(a)(2) by providing RNB–Target with enough information to allow it to conduct its reinvestigation. Defendant contends that its ACDV procedure is an adequate means of transmitting information and that it did not need to include a copy of Plaintiff's letter of dispute or any other additional information. The court agrees.

After receiving Plaintiff's letter of dispute, Defendant generated an ACDV, which indicated that Plaintiff disputed his liability for the account, specifically on the

---

**89.** *See* Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 14, Plaintiff's Deposition, pp. 49–50; Ex. 16, letter from Plaintiff to Defendant dated July 16, 2003; Ex. 17, consumer report dated Aug. 12, 2003.

**90.** *See id.* at Ex. 12, Deposition of Susan Wolf, p. 251.

**91.** Plaintiff argues that Defendant adopted its reinvestigation policy with reckless disregard to the rights of consumers, but produces no supporting evidence.

basis that the account was never joint.[92] The use of an ACDV form is an accepted method of communicating the details of a consumer dispute. *See Davis v. Equifax Info. Servs., LLC,* 346 F.Supp.2d 1164, 1176 (N.D.Ala.2004); *Quinn v. Experian Solutions,* No. 02 C 5908, 2004 WL 609357, at *6 (N.D.Ill. Mar.24, 2004). Nothing in the FCRA requires Defendant to append a copy of the consumer's dispute letter. Here, Defendant's ACDV form reveals the nature of Plaintiff's challenge and alerts RNB–Target to the need for review of the documentation establishing the account to determine whether Plaintiff ever was a joint obligor.

No summary judgment evidence indicates that RNB–Target needed any other information to complete a reinvestigation. To the contrary, the evidence shows that the information provided was sufficient.[93] Moreover, because Plaintiff provided RNB–Target with all the details of his dispute by separate letter dated the same day of his letter to Defendant, RNB–Target knew the details of Plaintiff's dispute.[94] Therefore, even if Defendant had provided additional information, RNB–Target's response would not have changed.[95] Based on these facts, no reasonable jury could find for Plaintiff.

Finding no violation of the all relevant information requirement, the court need not discuss whether Plaintiff suffered any harm caused by the violation or whether the violation could be characterized as willful.

### 4. Heightened Duty

Defendant disagrees with Plaintiff that it owed a heightened duty to investigate Plaintiff's dispute beyond contacting RNB–Target and accepting the creditor's response. Defendant argues that the requirement to go beyond the original source of information finds its roots in out-of-circuit law based on an earlier version of the FCRA. Even if it is applicable here, Defendant argues, its reinvestigation was reasonable as a matter of law. Although recognizing that the Fifth Circuit has imposed a heightened duty under certain circumstances, the court agrees that, under the present facts, Defendant's reinvestigation passes the reasonableness test.

The FCRA imposes no specific duty on a consumer reporting agency to conduct its own reinvestigation apart from contacting the furnisher of the disputed information. *See* 15 U.S.C. § 1681i. However, it does require that the reinvestigation be reasonable. *See* 15 U.S.C. § 1681i(a)(1)(A). The Fifth Circuit, along with other circuits, has recognized that a reasonable investigation may require a consumer reporting agency to go to greater depths in verifying accuracy than simply relying on the response by the original source of information. *See Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3rd Cir.1997)(holding that a consumer reporting agency may be required, in some cases, to verify the accuracy of its initial source of information); *Henson v. CSC Credit Servs.,* 29 F.3d 280, 287 (7th Cir.1994)(holding that a reporting agency may be required to verify the accuracy by way of a more thorough investigation);

---

**92.** Appendix in Support of Defendant's Motion for Summary Judgment, Vol. II, Docket Entry No. 29, Ex. 57, RNB–Target Aug. 9, 2003, response to ACDV form dated July 30, 2003.

**93.** *Id.* at Ex. 12, Deposition of Susan Wolf, p. 250.

**94.** *Id.* at Ex. 14, Plaintiff's Deposition, p. 50; Ex. 58, letter from Plaintiff to RNB dated July 16, 2003.

**95.** *See id.* at Ex. 12, Deposition of Susan Wolf, pp. 252–53, 310

*Stevenson,* 987 F.2d at 293 (holding that, given the complexity of the consumer dispute, the consumer reporting agency acted unreasonably in relying solely on CDV forms); *Pinner,* 805 F.2d at 1262 (holding that an agency's investigation was unreasonable where the only person contacted for verification was an individual who was known to have a poor relationship with the consumer). "In a reinvestigation of the accuracy of credit reports, a credit bureau must bear some responsibility for evaluating the accuracy of information obtained from subscribers." *Stevenson,* 987 F.2d at 293.

According to Seventh Circuit law, the duty to go beyond the original source arises when: 1) "the consumer has alerted the reporting agency to the possibility that the source may be unreliable" or the agency has reason to question the source's reliability; and 2) "the cost of verifying the accuracy of the source [does not outweigh] the possible harm inaccurately reported information may cause the consumer." *Henson,* 29 F.3d at 287; *see also Pinner,* 805 F.2d at 1262 (favorably citing a case in which the Sixth Circuit held that merely making two phone calls to creditors was unreasonable when the agency was aware of disputes between the creditors and the consumer). Many district courts recently have employed the *Henson* factors when measuring reasonableness. *E.g., McKeown v. Sears Roebuck & Co.,* 335 F.Supp.2d 917, 935 (W.D.Wis.2004); *Neal v. CSC Credit Servs., Inc.,* No. 8:02CV378, 2004 WL 628214 (D.Neb. Mar.30, 2004), at *5; *Quinn,* 2004 WL 609357, at *6. Weighing these factors to assess the reasonableness of the agency's investigation is left to the jury. *Henson,* 29 F.3d at 287; *Cushman,* 115 F.3d at 225–26.

In this case, Plaintiff failed to present evidence from which a reasonable jury could find that Defendant was alerted to the possibility that RNB–Target was unreliable. Defendant produced evidence of a long-standing contractual relationship with RNB–Target pursuant to which Target certified the accuracy of the information it provided Defendant.[96] The testimony demonstrates that no report of unreliability had been made to Defendant regarding information from RNB–Target over the course of at least eleven years and that Defendant had no reason to question RNB–Target's reliability.[97] Despite Plaintiff's own accusations of Target's "deaf[ness] to reality,"[98] "bureaucratic bungling,"[99] and "feckless attitude,"[100] Plaintiff failed to produce evidence that Defendant knew RNB–Target was an unreliable source of information. Regardless of the intensity of Plaintiff's complaints about RNB–Target or the volume and degree of his displeasure, Plaintiff's disagreement with RNB–Target, on its own, is insufficient to raise an issue of reliability, especially in light of Defendant's long history with Target without complaint. *See Anderson v. Trans Union LLC,* 367 F.Supp.2d 1225, 1233 (W.D.Wis.2005)(stating that the only evidence of unreliability was the mistakes in that particular case, which could not be relied upon as evidence that the creditor was unreliable). Even assuming the *Henson* factors are recognized by the Fifth Circuit as a method for determining the reasonableness of a con-

---

**96.** *See* Appendix in Support of Defendant's Motion for Summary Judgment, Vol. ' II, Docket Entry No. 29, Ex. 11, Declaration of William R. Stockdale, ¶ 12.

**97.** *See id.* at ¶ 13.

**98.** *See id.* at Ex. 16, letter from Plaintiff to Defendant dated July 16, 2003, p. 3.

**99.** *See id.*

**100.** *See id.*

sumer reporting agency's reinvestigation, Plaintiff cannot survive summary judgment without some evidence of unreliability.

Overall, no reasonable jury could find Defendant's investigation was unreasonable. As detailed above, Defendant responded to Plaintiff's dispute by reviewing his letter, notifying RNB–Target by ACDV, updating the date reported according to RNB–Target's instructions, mailing the results to Plaintiff, and completing the process within the statutory time period. Defendant generally followed the procedures outlined in section 1681i, responded to all of Plaintiff's correspondence and telephone calls, completed a second reinvestigation on its own initiative, provided Plaintiff with the name, address, and telephone number for Target, and added Plaintiff's statement of dispute to his report. Therefore, Defendant could not be said to have ignored the FCRA reinvestigation requirements.

### B. · *Libel Claim*

 ■  Under Texas state law, "[a] libel is a defamation expressed in written or other graphic form that ... tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." Tex. Civ. Prac. & Rem.Code 73.001. The FCRA provides consumer credit agencies with qualified immunity from defamation claims unless they reported false information "with malice or willful intent to injure such consumer." 15 U.S.C. § 1681h(e); *see also Cousin*, 246 F.3d at 375. Defamation with malice requires proof that the defendant either knew the published words were false when published or published them with reckless disregard for their truth. *Cousin*, 246 F.3d at 375.

Defendant argues that the information was accurate, barring any claim for defamation, and that, even if the information was inaccurate, Defendant was entitled to statutory qualified immunity. Plaintiff insists that he was not responsible for the debt as was reflected in the credit report and that Defendant published the information with knowledge that it was false or in reckless disregard for whether it was false.

As discussed above, the court finds no evidence of malice or willful intent to injure Plaintiff. Therefore, Plaintiff cannot maintain a defamation claim. *See Cousin*, 246 F.3d at 376 n. 24 (noting, without expressing the Fifth Circuit's view, that the Eighth Circuit recognizes a higher standard of proof of willfulness to overcome qualified immunity than required to justify punitive damages). Plaintiff points the court to absolutely no evidence that would support such a finding. Thus, Plaintiff's libel claim should be dismissed.

### IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's summary judgment motion be **GRANTED**. Plaintiff's Motion to Strike Defendant's Motion for Summary Judgment is **DENIED**. Defendant's motion to strike Plaintiff's response evidence is **DENIED** and Plaintiff's objections to Defendant's evidence are **OVERRULED**. If this Memorandum and Recommendation is adopted, all remaining motions should be **DENIED AS MOOT**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have ten days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the fac-

tual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, either electronically or by mail to P.O. Box 61010, Houston, Texas, 77208. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

July 20, 2005.